51 F.3d 1511
 63 USLW 2639, 1995-1 Trade Cases P 70,951
 COORS BREWING COMPANY, a Colorado corporation, Plaintiff-Appellee,
v.
MOLSON BREWERIES, an Ontario partnership; Molson Breweries
of Canada Limited, a Canadian corporation,
Defendants-Appellants,
and
Miller Brewing Company, a Wisconsin corporation; The Molson
Companies Limited, a Canadian corporation; and
Molson Breweries, U.S.A., Inc., a
Delaware corporation, Defendants.
 No. 94-1217.
 United States Court of Appeals,
Tenth Circuit.
 March 30, 1995.
 
 Thomas F. Cullen, Jr., Jones, Day, Reavis & Pogue, Washington, DC (Donald I. Baker, Michael P. Gurdak, Deena B. Jenab also of Jones, Day, Reavis & Pogue, Washington, DC, and Russell Carparelli, Tim L. Campbell and Matthew S. McElhiney, Bradley, Campbell, Carney & Madsen, Golden, CO, with him on the briefs), for plaintiff-appellee Coors Brewing Co.
 A. Paul Victor, Weil, Gotshal & Manges, New York City (Debra J. Pearlstein, Ronald C. Wheeler and Eileen S. Simon, also of Weil, Gotshal & Manges, New York City, and Jane Michaels, Donald A. Degnan and James E. Hartley, of Holland and Hart, Denver, CO, with him on the briefs) for defendants-appellants Molson Breweries and Molson Breweries of Canada, Ltd.
 Before LOGAN and HENRY, Circuit Judges, and REED*, District Judge.
 HENRY, Circuit Judge.
 
 
 1
 Defendant Molson appeals the decision of the district court denying its motion to stay plaintiff Coors's antitrust suit pending contract arbitration. We have jurisdiction pursuant to 9 U.S.C. Sec. 16. We affirm the decision of the district court in part, and reverse in part.
 
 I. BACKGROUND
 
 2
 Coors Brewing Company (Coors)[1] is a Colorado corporation engaged in the business of brewing, marketing, and distributing beer. In 1985, Coors entered into a licensing agreement with Molson Breweries of Canada Limited (Molson), a Canadian corporation also in the beer industry. Coors and Molson agreed that Molson would brew and distribute Coors products in Canada. Under the terms of the agreement, Coors gave Molson access to Coors trademarks, brewing processes, and marketing information. Molson, in turn, agreed to use its best efforts to distribute Coors products in Canada and to keep marketing and product information confidential. The agreement further provided that either party could terminate the agreement for cause under a specified procedure, or without cause by giving the other party ten years notice of termination. The agreement also contained an arbitration clause: "Any dispute arising in connection with the implementation, interpretation or enforcement of this Agreement, except as provided in 4.02, shall be finally settled under the Rules of the American Arbitration Association....".[2] License Agreement Sec. 6.10, Aplt.App. at 86.
 
 
 3
 In 1993, Miller Brewing Company (Miller), a Wisconsin corporation also in the business of brewing and marketing beer, entered into a partnership with Molson.[3] Although the Miller-Molson agreement is not part of the record in this case, Coors and Molson both represent that the agreement gave Miller one seat on Molson's board of directors and created a reciprocal licensing arrangement. Under the reciprocal licensing arrangement, Miller is the exclusive distributor of Molson products in the United States and Molson is the exclusive distributor of Miller products in Canada.
 
 
 4
 Coors filed a Notice of Arbitration with Molson, alleging that Molson breached its contract with Coors, and seeking injunctive relief, damages, and termination of the licensing agreement. Coors also filed the instant complaint in United States District Court against Molson and Miller alleging antitrust violations of the Clayton and Sherman Acts. In its exhaustive complaint, Coors makes allegations that we divide into three general categories. First, Coors alleges that the Miller-Molson alliance is a combination in restraint of trade, lessening competition in the United States and North American beer markets.[4] Second, Coors alleges that Miller will have access to Coors's confidential product and marketing information. Third, Coors alleges that Miller will control the distribution and marketing of Coors brands in Canada. Molson brought a motion to stay the antitrust proceedings against both Molson and Miller pending the resolution of the contract arbitration. The district court denied the motion, and Molson sought expedited appeal.
 
 II. DISCUSSION
 A. Coors v. Miller
 
 5
 Molson argues that the district court erred when it denied Molson's motion to stay Coors's antitrust action against Molson. In short, Molson argues that Coors has dressed up its contract claims in antitrust clothes to avoid its own agreement to arbitrate. Specifically, Molson argues that a valid arbitration agreement exists between Coors and Molson, that arbitration will settle factual issues important to the antitrust claims, and that a stay is appropriate even if the factual grounds for the contract arbitration and antitrust suit are different.
 
 
 6
 Coors, on the other hand, argues that the contract and antitrust claims are separate. It claims two distinct interests: protecting its contractual rights, which it concedes are subject to arbitration, and protecting its interest in competition in the United States and North American beer markets, which it argues is not subject to arbitration. In short, Coors argues that it should be able to pursue an antitrust suit unrelated to the contract just as any other beer manufacturer or consumer could. This court reviews the underlying arbitrability of a contract de novo. O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 901 (10th Cir.1992).
 
 
 7
 The Federal Arbitration Act (FAA), 9 U.S.C. Sec. 3, requires a district court to stay judicial proceedings where a written agreement provides for the arbitration of the dispute that is the subject of the litigation.[5] "There is a strong federal policy favoring arbitration for dispute resolution." Peterson v. Shearson/American Express, Inc., 849 F.2d 464, 465 (10th Cir.1988); see also Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). The policy basis of this statute is particularly strong in the context of international transactions. Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S., 9 F.3d 1060, 1063 (2d Cir.1993). All "doubts are to be resolved in favor of arbitrability." Oil, Chem., & Atomic Workers Int'l Union, Local 2-124 v. American Oil Co., 528 F.2d 252, 254 (10th Cir.1976). In addition to the general policy favoring arbitration, Molson argues that Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), stands for the proposition that antitrust claims within the scope of a contract can be subject to arbitration, even if the arbitration clause does not specifically mention antitrust disputes.
 
 
 8
 In Mitsubishi, Puerto Rican car dealership Soler Chrysler-Plymouth Corporation contracted with Mitsubishi to distribute cars in Puerto Rico. During the 1981 recession, Soler could not sell its allotment of cars. In a strategy designed to avoid breaching its contract, Soler asked Mitsubishi to sell Soler certain automobile parts such as defoggers and heaters so that it could export the cars Mitsubishi manufactured for Puerto Rico's relatively gentle climate to North, Central, and South America. Citing concerns that Soler would hurt Mitsubishi's reputation because Soler could not produce factory-quality cars, had no experience in the transshipment of cars, and could not provide maintenance in other markets, Mitsubishi refused to sell Soler the parts or allow it to transship the cars. When Soler refused to accept shipment of the cars it had contracted to sell, Mitsubishi brought an action against Soler in United States District Court under the FAA.[6] Soler counterclaimed, alleging that Mitsubishi had violated the Sherman Act by conspiring to divide markets when it refused to cooperate with Soler. Mitsubishi next filed a motion to stay the district court proceedings pending the arbitration. The district court granted the motion and Soler appealed.
 
 
 9
 The First Circuit Court of Appeals affirmed the district court's determination that Soler's claims were within the scope of the contract and thus the arbitration agreement, Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 723 F.2d 155, 159-61 (1st Cir.1983), aff'd in part and rev'd in part, 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985), but held that the agreement to arbitrate antitrust claims was void as against public policy, id. at 164-68.
 
 
 10
 The United States Supreme Court adopted the First Circuit's determination that the antitrust claims were within the scope of both the contract and the arbitration clause. However, the Supreme Court reversed the Court of Appeals on whether a clause providing for the arbitration of antitrust disputes was void as against public policy. Mitsubishi, 473 U.S. at 629, 105 S.Ct. at 3355. The Supreme Court emphasized the importance of keeping one's word and reasoned that a " 'representative of the American business community' " must honor its agreement to arbitrate contractual disputes. Id. at 640, 105 S.Ct. at 3361 (quoting Alberto-Culver Co. v. Scherk, 484 F.2d 611, 620 (7th Cir.1973) (Stevens, J., dissenting), rev'd, 417 U.S. 506, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974)).
 
 
 11
 Coors argues that the FAA and Mitsubishi do not control this dispute for two reasons: First, Coors argues that the arbitration clause in the Coors-Molson license agreement is a narrow arbitration clause and that it does not include antitrust disputes. Second, Coors argues that even if the arbitration clause includes antitrust disputes, its antitrust claims are outside the scope of the contract and thus not subject to the contractual arbitration clause.
 
 1. Arbitration Clause
 
 12
 Coors first seeks to distinguish Mitsubishi by arguing that the Coors-Molson arbitration clause is more narrow than the Mitsubishi arbitration clause and does not cover the arbitration of antitrust disputes. Coors points to cases discussing the differences between general and narrow contractual arbitration clauses. See, e.g., McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co., 858 F.2d 825, 832 (2d Cir.1988). Coors argues that while the arbitration clause in Mitsubishi is a general arbitration clause which covers "all disputes" arising out of the contract, the Coors-Molson arbitration clause is a narrow arbitration clause covering only "any dispute" arising from the "implementation, interpretation, and enforcement" of the agreement.
 
 
 13
 However, Coors does not cite any authority holding that the arbitration clause at issue is a narrow arbitration clause or that this antitrust dispute does not arise from the "implementation, interpretation, and enforcement" of the agreement; it merely asserts that the instant clause is a narrow one. In addition, Coors does not make an interpretive argument or suggest any intuitive reason why the Coors-Molson arbitration clause does not cover antitrust disputes. Without a persuasive argument explaining why the parties meant this apparently broad language to exclude antitrust disputes, the comprehensive nature of the terms "implementation" and "enforcement" in the arbitration clause, the agreement to arbitrate all matters involving the "interpretation" of the agreement, and the public policy in favor of arbitration compel us to read the arbitration clause to include antitrust disputes. We therefore conclude that the language "any dispute arising in connection with the implementation, interpretation or enforcement" in the Coors-Molson arbitration clause covers antitrust disputes in this case, provided that those disputes are within the scope of the agreement.
 
 2. Scope of Contract
 
 14
 Having concluded that the Coors-Molson arbitration clause encompasses antitrust disputes, we turn to Coors's second argument and determine whether Coors's claims are within the scope of the contract. Coors argues that its claims are unrelated to the contract and that the antitrust dispute is therefore not subject to the contractual arbitration agreement. We hold that some of Coors's antitrust causes of action are within the scope of the Coors-Molson licensing agreement and that some of Coors's claims are outside the scope of that contract.
 
 
 15
 Although the Supreme Court in Mitsubishi reversed the First Circuit's holding that public policy prohibited the involuntary arbitration of antitrust claims, it adopted and affirmed the First Circuit's determination that the antitrust claims were within the scope of that contract. See Mitsubishi, 473 U.S. at 618 n. 1, 622 n. 9, 628, 105 S.Ct. at 3349 n. 1, 3351 n. 9, 3354-55.[7] The First Circuit's discussion of the contract in Mitsubishi emphasized that the antitrust claims were closely related to the contract because they turned upon specific contractual provisions. Mitsubishi, 723 F.2d at 159-61. The First Circuit phrased its initial inquiry as "whether the factual allegations underlying Soler's counterclaims--and Mitsubishi's bona fide defenses to those counterclaims--are within the scope of the arbitration clause." Id. at 159. The First Circuit then emphasized that Mitsubishi's refusal to allow Soler to transship cars was premised upon concerns that Soler would not produce quality products and that such considerations were relevant to assessing the legality of Mitsubishi's actions under Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977).[8] The First Circuit concluded that because Mitsubishi based its refusal to deal on concerns about trademarks, reputation, and goodwill--considerations that the contract specifically addressed--the antitrust claims were within the scope of the contract: "We need not delve further into the merits of Mitsubishi's defense, however, for it is enough for present purposes that its trademark and goodwill concerns are plainly germane to Soler's antitrust allegations." Mitsubishi, 723 F.2d at 160.
 
 
 16
 Explicitly basing its opinion on this connection between the contract and the antitrust claims, the First Circuit concluded that the antitrust claims were within the scope of the contract. An arbitration clause "does not extend to all disputes of any sort ... but only to disputes touching specified provisions of the agreement." Id. at 159. The First Circuit's basis for holding the antitrust claims to be within the scope of the contract thus logically limits the Supreme Court's holding in Mitsubishi to antitrust claims that have a reasonable factual connection to the contract. In this case, Mitsubishi provides no support for categorically concluding that Coors must take all of its antitrust claims to arbitration. We therefore hold that Coors's antitrust claims that do not implicate the contract are litigable.
 
 
 17
 In addition to basing our opinion limiting contractual arbitration of antitrust suits to those antitrust claims related with a contract upon Mitsubishi, there are practical reasons to read Mitsubishi in a more limited way than Molson suggests. As Molson's counsel acknowledged at oral argument, its interpretation of Mitsubishi is that every brewer in America except Coors may bring an antitrust action against Molson. Although Mitsubishi allowed parties to a contract to compel the arbitration of their antitrust disputes, it did not proclaim that all disputes between parties who include an arbitration clause in their contracts are subject to arbitration. A dispute within the scope of the contract is still a condition precedent to the involuntary arbitration of antitrust claims. See AT & T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986) (holding that arbitration is a matter of contract and that a party cannot be required to submit to arbitration any suit it has not agreed to arbitrate). A contrary reading of Mitsubishi not only ignores the facts of that case, but also could lead to absurd results. For example, if two small business owners execute a sales contract including a general arbitration clause, and one assaults the other, we would think it elementary that the sales contract did not require the victim to arbitrate the tort claim because the tort claim is not related to the sales contract. In other words, with respect to the alleged wrong, it is simply fortuitous that the parties happened to have a contractual relationship. Similarly, in this case, Coors is entitled to litigate its antitrust claims regarding the Miller-Molson relationship in a public forum so long as the claims are not related to the licensing agreement.
 
 
 18
 Molson next argues that the policy behind arbitration supports staying the antitrust litigation until the arbitration has resolved factual issues that are the basis for the antitrust litigation. See, e.g., Institute of Mission Helpers v. Reliance Ins. Co., 812 F.Supp. 72, 76 (D.Md.1992) (observing that a stay can conserve judicial resources and avoid anomalous results). However, Molson cites no authority for the proposition that the courts of the United States must defer to an ongoing arbitration simply because the facts and parties may be similar. Conversely, the Supreme Court has held that litigation must proceed in a "piecemeal" fashion if the parties intended that some matters, but not others, be arbitrated. Dean Witter Reynolds, Inc. v. Byrd, 470 U.S. 213, 221, 105 S.Ct. 1238, 1242-43, 84 L.Ed.2d 158 (1985); see also, Armco Steel Co. v. CSX Corp., 790 F.Supp. 311, 317 n. 4 (D.D.C.1991) ("Any alleged 'intertwining' of [the] contract claim with the other claims of [the] complaint does not require the Court to submit the entire complaint to arbitration. The 'intertwining' approach ... was rejected by the Supreme Court in Dean Witter....").
 
 
 19
 Finally, Molson relies upon one commentator for the proposition that a general arbitration clause will subject all antitrust disputes to arbitration unless they are specifically excluded. "Anyone involved in an ongoing commercial relationship must be aware that a general arbitration clause now can require arbitration of an antitrust dispute, even if the clause predates Mitsubishi and the arbitration process and arbitrator selected are ill-suited to an antitrust dispute." Donald I. Baker & Mark R. Stabile, Arbitration of Antitrust Claims: Opportunities and Hazards For Corporate Counsel, 48 Bus.Law. 395, 407-08 (1993).[9] This is good advice, especially for the risk-averse audience of corporate counsel for whom it is intended. Had Coors explicitly exempted antitrust disputes from its arbitration clause, it could have avoided this round of litigation.
 
 
 20
 However, a close reading shows that the Baker & Stabile article actually supports Coors in this case. The article is mainly intended to advise joint-venture partners and others engaged in continuing relationships "concerning the terms of their contract" how they can avoid arbitrating their antitrust disputes. Id. at 398-99.[10] In this case, it is only the claims not related to Coors's and Molson's continuing contractual relationship that are litigable.
 
 
 21
 a. Claims Related to the Market
 
 
 22
 We reiterate that Coors may litigate antitrust claims not related to the licensing agreement just as anyone else with standing may. Coors's claims regarding market concentration are not related to the licensing agreement, and Coors may therefore litigate those claims.
 
 
 23
 b. Claims Related to the Marketing Agreement
 
 
 24
 Coors's claims regarding confidentiality and proprietary information involve the Coors-Molson licensing agreement. Like the First Circuit in Mitsubishi, we conclude that the contractual arbitration clause controls this dispute. Molson gained access to the Coors information because of the parties' contractual relationship. Also under the terms of their contract, both parties agreed to arbitrate claims arising from this contract. We therefore reverse the district court and hold that Coors must keep its promise to arbitrate its allegations involving confidential product and marketing information.
 
 
 25
 c. Control of Molson
 
 
 26
 Coors's least developed and most novel claim is that Miller's control over Molson will have an anti-competitive effect on the United States and North American beer markets. Coors argues that Miller holds a seat on Molson's board of directors, that Molson's bylaws require a unanimous vote of all directors, and that Miller may thus be in a position to control the distribution of Coors products. This claim presents the most difficult question because Coors has not specifically stated how Miller's control over Molson will create anti-competitive effects. However, Molson has not argued that Coors has failed to meet the requirements of notice pleading. See, e.g., American Nurses' Ass'n v. Illinois, 783 F.2d 716, 723 (7th Cir.1986) (discussing the advent of notice pleading); Charles Alan Wright, Law of Federal Courts Sec. 68, at 475-76 (5th ed. 1994) (arguing that district courts should not require more detailed pleadings in complex antitrust and securities litigation than they do in cases of ordinary complexity, and collecting cases). In addition, we note that one commentator has suggested that advertising may be a legitimate antitrust issue in the beer industry.[11]
 
 
 27
 Without making a final judgment as a matter of law on any theory, we conclude that Coors has presented a sufficient factual outline to suggest that it might develop a theory unrelated to the Coors-Molson licensing agreement. Coors is therefore entitled to conduct discovery and refine its theories. However, we do not make a final judgment on any control theory because the record before us is insufficient to allow it. At a later point in this litigation, Molson may again challenge Coors's claims, with respect to both their relation to the licensing agreement and their legal sufficiency. At that point, with additional briefing and discovery, we believe that the district court will be in the proper position to make appropriate findings of fact and reach conclusions of law.
 
 B. Coors v. Miller
 
 28
 Molson also argues that Coors's action against Miller should be stayed. We review the failure of a district court to grant a stay as to a non-arbitrating party for an abuse of discretion. See, e.g., Moses H. Cone Memorial Hosp., 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. Staying such a party is based upon considerations of judicial efficiency. See Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc., 760 F.Supp. 1036, 1045 (E.D.N.Y.1991). In addition, courts have held that arbitration should proceed in tandem with non-arbitrable litigation. See Armco Steel, 790 F.Supp. at 316; Pensacola Constr. Co. v. St. Paul Fire & Marine Ins. Co., 705 F.Supp. 306, 308 (W.D.La.1989). Finally, the district court's control of its docket is an important factor. Moses H. Cone Memorial Hosp., 460 U.S. at 20 n. 23, 103 S.Ct. at 939 n. 23. Given this authority and the current posture of this litigation, we see no evidence that the district court abused its discretion in refusing to stay Coors's claim against Miller.
 
 III. CONCLUSION
 
 29
 We AFFIRM the district court's denial of Molson's motion to stay this action as to Coors's allegations that Molson and Miller are engaged in a conspiracy to monopolize the North American beer market. We REVERSE the decision of the district court as to Coors's allegations regarding proprietary information. We make a preliminary determination that Coors's allegation that Miller's control over Molson will lead to anticompetitive effects is not related to the licensing agreement. However, the district court should reconsider the Molson motion after the parties have had the opportunity to conduct discovery and refine their theories.
 
 
 
 *
 Honorable Edward C. Reed, Jr., Senior District Judge, United States District Court for the District of Nevada, sitting by designation
 
 
 [1]
 During the term of the agreement, the Coors corporate entity involved in the instant transaction changed. Because that change is not relevant to our analysis, we refer to the present corporate entity involved in this case
 
 
 [2]
 Sec. 4.02 provides for disputes regarding accounting and auditing. See License Agreement Sec. 4.02, Aplt.App. at 73-74
 
 
 [3]
 Under the agreement, Miller acquired 20%, Foster's Brewing Group acquired 20%, and the Molson entity formerly owning Molson retained 40% of the partnership wholly owning Molson. Coors has brought suit against both Molson and the new Miller-Molson-Fosters partnership that now wholly owns Molson
 
 
 [4]
 Coors argues that in this era of liberalized trade, Molson has the ability to brew American brands in Canada and distribute the beer in the United States as well as Canada
 
 
 [5]
 The Act provides that:
 If any suit or proceeding be brought ... upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall ... stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement....
 9 U.S.C. Sec. 3.
 
 
 [6]
 The Mitsubishi arbitration clause provided:
 "All disputes, controversies or differences which may arise between [Mitsubishi] and [Soler] out of or in relation to Articles I-B through V of this Agreement or for the breach thereof, shall be finally settled by arbitration in Japan in accordance with the rules and regulations of the Japan Commercial Arbitration Association."
 Mitsubishi, 473 U.S. at 617, 105 S.Ct. at 3349.
 
 
 [7]
 The dissent in Mitsubishi also explicitly noted that it understood the First Circuit to have concluded that the antitrust claims were within the scope of the contract. Justice Stevens noted his disagreement with the "Court of Appeals' construction of the arbitration clause" and stated that he would not have interpreted the contract to relate to the antitrust dispute. Mitsubishi, 473 U.S. at 641, 644, 105 S.Ct. at 3361, 3362-63 (Stevens, J., dissenting)
 
 
 [8]
 The First Circuit's citation to Sylvania is important to understanding why Soler's claims implicated the contract. Prior to Sylvania, the Supreme Court had enforced a per se rule against vertical nonprice restrictions. Vertical nonprice restrictions "typically involve the allocation of territorial or customer markets by a manufacturer to a wholesale distributor or retail dealer." 2 Julian O. von Kalinowski, Antitrust Laws and Trade Regulation Sec. 6.02[e] (perm. ed. rev. vol. 1994). However, vertical nonprice restraints could include factors such as locations of outlets or customer service requirements. Id. Sec. 6.02; Herbert Hovenkamp, Economics and Federal Antitrust Law Sec. 9.4 (1985). In Sylvania, however, the Supreme Court overturned its precedent and reinstituted rule of reason analysis for at least some vertical restraints. Sylvania, 433 U.S. at 57, 97 S.Ct. at 2561; see also Hovenkamp Sec. 4.3 (discussing joint-ventures). The First Circuit's citation to Sylvania thus suggests that it considered Mitsubishi's argument that it was concerned about trademarks and reputation a reasonable one under the Mitsubishi-Soler contract. Mitsubishi, 723 F.2d at 160
 
 
 [9]
 Molson notes that although Mr. Baker represents Coors, his scholarship is contrary to Coors's position in this case. Whether Mr. Baker wrote the article at issue is of course irrelevant to our evaluation of its analysis. However, the irony is not lost on anyone who has stood with his or her collected writings before the Senate Judiciary Committee
 
 
 [10]
 The article divides antitrust causes of action into four general categories: (1) Disputes between horizontal partnerships and disputes between manufacturers and sellers in vertical relationships; (2) Buyer-seller disputes; (3) Disputes involving damage to the market; and (4) Disputes between competitors. Id. at 399-400. The article then explicitly states that while careful planning can enable contracting parties to deal with the first two categories of conflicts, the third and fourth categories are not suited to arbitration because they do not normally involve contractual relationships. Id. In this case, the litigable antitrust disputes are in either category three or four and are not related to the contract
 
 
 [11]
 This commentator suggests that the American beer market's oligopolistic tendencies and emphasis upon advertising make marketing an important antitrust issue: "In terms of traditional antitrust criteria ... the beer market simply evades analysis." Elizabeth Mensch & Alan Freeman, Efficiency and Image: Advertising as an Antitrust Issue, 1990 Duke L.J. 321, 371