**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**SEP 11 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RILEY MANUFACTURING
COMPANY, INC.,

    Plaintiff-Counter-Defendant -
Appellee,

v.

ANCHOR GLASS CONTAINER
CORPORATION,

    Defendant-Counter-Claimant-
Appellant,

    and

TREND PLASTICS, INC.,

    Defendant-Counter-Claimant.

No. 96-3299

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 96-CV-2309)**

---

Steven L. Brannock, (Rebecca H. Steele with him on the briefs) of Holland &
Knight, LLP, Tampa, Florida, for the appellant.

James Robert McKown, (Gardiner B. Davis with him on the brief) of Spencer
Fane Britt & Browne, LLP, Kansas City, Missouri, for the appellee.

---

Before **PORFILIO** and **EBEL,** Circuit Judges, and **BRETT**, Senior District Judge.[*]

---

**EBEL**, Circuit Judge.

---

This copyright and trade secret dispute between two former commercial partners, now competitors, requires us to examine the federal common law of arbitrability. Under that law, we disagree with the district court's conclusion that there was no valid and enforceable arbitration agreement between the parties. Instead, we find that at least a portion of the dispute in this case appears to be arbitrable. Therefore, we must reverse and remand.

**Background**

Since the early 1980s, Riley Manufacturing Company ("Riley"), based in Olathe, Kansas, has been in the business of making "sun tea" jars with copyrighted ornamental designs stenciled on the glass and plastic containers. Riley had a long-term relationship with Trend Plastics, Inc. ("Trend"), also based in Olathe, Kansas, to supply the plastic spigots and plastic lids that were made from injection molds that Riley designed and over which Riley asserted trade

---

[*] The Honorable Thomas R. Brett, Senior District Court Judge, Northern District of Oklahoma, sitting by designation.

secret protection. In 1989, Riley began using Anchor Glass Container Corporation ("Anchor Glass"), based in Tampa, Florida, as its supplier of glass jars.

In 1991, facing difficulties in increasing its own distribution network, Riley went to Anchor Glass to work out a deal whereby Anchor Glass would distribute Riley's sun tea products through Anchor Glass' nationwide distribution network. In the contract memorializing this arrangement (the "Manufacturing Agreement"), Riley agreed to provide all of Anchor Glass' needs for sun tea jars, up to 3.75 million units per year, and Anchor Glass agreed to use "reasonable efforts" to market Riley's sun tea products. The agreement provided various specifications for the manufacturing and distribution relationship between Riley and Anchor Glass, but the three provisions that are most relevant in this dispute are the copyright-assignment, termination, and arbitration clauses.

The copyright provisions in the Manufacturing Agreement indicated that Riley already had assigned to Anchor Glass the copyrights for all of the ornamental designs that were then being used on the sun tea containers that Anchor Glass would be selling for Riley. Riley also agreed to assign to Anchor Glass the copyrights in any new ornamental designs it created during the life of the manufacturing relationship. However, in the event that Anchor Glass terminated the parties' distribution arrangement, Anchor Glass agreed to reassign

to Riley any of the copyrights that Riley initially had transferred to Anchor Glass. Furthermore, although Anchor Glass would have the right to sell off its remaining inventory of Riley-manufactured sun tea jars when the contract expired, it would have no right to use or sell the Riley designs after the copyrights were reassigned to Riley.

Under the termination clause, the parties specified what continuing rights each would have when the three-year contract expired. Most importantly for the purposes of this case, Anchor Glass was given the right to manufacture sun tea jars with spigots that were "substantially identical" to Riley's spigots, but Anchor Glass would have no right to use Riley's injection molds for the creation of these "substantially identical" plastic spigots. This provision essentially allowed Anchor Glass to manufacture sun tea jars – although not with Riley's ornamental designs – as long as Anchor Glass went to the trouble of creating its own injection molds, a process that Riley claims is expensive and time-consuming. Furthermore, although the termination clause allowed Anchor Glass to manufacture "substantially identical" spigots, the contract is not explicit about possible infringements of Riley's trade dress in the overall appearance of the sun tea products.

Finally, under the arbitration clause, the parties agreed to resolve "any and all disputes arising out of or relating to this Agreement" by way of binding

- 4 -

arbitration.[1]  The arbitration clause required that the site of any arbitration be in Anchor Glass' home city of Tampa, Florida.

In 1994, after two successive amendments of the Manufacturing Agreement to update pricing and supply provisions, Anchor Glass gave Riley notice of its intent not to renew the production-distribution arrangement.  As a result, the Manufacturing Agreement expired by its own terms on July 31, 1994.

In January 1995, Riley discovered that Anchor Glass had sold various sun tea jars that incorporated several ornamental designs that allegedly were copies of certain Riley designs.  As a result, Riley threatened a copyright suit against Anchor Glass.  There is no evidence in the record as to whether Anchor Glass or Riley ever triggered the arbitration procedures of the Manufacturing Agreement for this particular dispute.  In any event, the parties reached a Release and Settlement Agreement (the "Settlement Agreement") on July 5, 1995, to resolve

---

[1]The arbitration clause reads as follows:

> Anchor and Riley shall attempt to resolve any and all disputes arising out of or relating to this Agreement by amicable negotiations.  If any such dispute cannot be resolved within thirty  (30) days after either party gives a written notice to the other party initiating negotiations pertaining to such dispute, the parties shall submit such dispute to arbitration in Tampa, Florida in accordance with the Commercial Arbitration Rules of the American Arbitration Association.  The award of the arbitrators shall be binding on the parties and enforceable by any court having jurisdiction.

the dispute.

Under the Settlement Agreement, Riley agreed to drop its threatened copyright suit, and Anchor Glass agreed to drop what apparently were its own threatened counterclaims.[2] The language of the mutual releases constitutes an extremely broad waiver of "any and all" claims either party "now has or could ever have or become entitled to," which might arise under the Manufacturing Agreement.[3]

---

[2]The parties have not indicated whether Anchor Glass actually threatened to assert any counterclaims in this 1995 dispute, but the Settlement Agreement's release clause makes reference to Anchor Glass' waiver of any "claims" or "defenses" raised in the threatened litigation. This language suggests that Anchor Glass must have asserted some kind of potential counterclaim in the dispute.

[3]The text of paragraph 5.3 – the release relevant to Anchor Glass – reads as follows:

> Anchor fully and forever releases and discharges Riley and its respective agents, attorneys, employees, parents, affiliates, successors and assigns (collectively referred to as "Releasees"), of and from any and all responsibilities, duties, obligations, claims, demands, debts, sums of money, accounts or causes of action or actions, costs, losses, damages or liabilities of whatsoever character, nature, kind or designation in law or in equity, absolute or contingent, matured or unmatured, suspected or unsuspected, known or unknown which Anchor or anyone claiming under, by or through it now has or could ever have become entitled to assert against any of the Releasees by reason of the claims raised in the Threatened Lawsuit or defenses thereto, or arising out of any of the following matters existing between the parties on the date of this

(continued...)

In addition to these mutual releases, the Settlement Agreement also includes a series of provisions designed to reestablish a manufacturing relationship between Riley and Anchor Glass. Under Article IV, the parties agreed that Riley would manufacture nearly 400,000 sun tea jars for Anchor Glass during each of the 1996 and 1997 sun tea seasons. Furthermore, the parties agree that Anchor Glass is expected to cease using Riley's injection molds for its own sun tea products, but that if Anchor Glass does make short-term use of the molds, it would pay a prescribed royalty.

Finally, the Settlement Agreement includes a merger clause: "This Agreement constitutes the entire agreement of the parties hereto and cancels, terminates and supersedes any and all prior representations and agreements relating to the subject matter thereof." The crucial final phrase of this provision – i.e., the words "relating to the subject matter thereof" – is undefined and there is no cross-reference with other text in the Settlement Agreement.

---

[3](...continued)
Agreement: (i) any Anchor claims arising under the Manufacturing Agreement between the parties referenced in ¶ 3.2 and all other agreements or documents executed in connection therewith; (ii) any unfilled portion of Anchor's order placed with Riley to print approximately 5 million tumblers; (iii) Anchor's claim that Riley pay advertising costs incurred by Waukama; and (iv) Anchor's claim that several truckloads of printed seconds (jars) shipped by Riley to Anchor at Columbus, Ohio, was short.

Perhaps most importantly, the Settlement Agreement includes no arbitration provision and makes no mention of any other dispute resolution mechanisms. The Settlement Agreement also makes no reference to the arbitration clause of the Manufacturing Agreement.

In March 1996, some eight months after the Settlement Agreement resolved the first copyright dispute, Riley discovered that Anchor Glass was selling sun tea jars that incorporated three ornamental designs that allegedly infringed upon three of Riley's designs. Riley also discovered what it considered to be evidence that Anchor Glass and Trend had made unauthorized use of Riley's injection molds to produce copies of Riley's spigots. As a result, in June 1996, Riley filed the present suit in federal court.[4]

Riley's suit alleges eight different causes of action, each of which separately attacks the three allegedly improper acts at issue in this case: copying Riley's ornamental designs, copying Riley's plastic spigot design, and copying Riley's trade dress in the overall appearance of its sun tea products. The eight causes of action are as follows:

I. Copyright infringement - for copying the ornamental designs.
II. Breach of contract - for violating the prohibitions in the Manufacturing

---

[4]Trend Plastics was not subject to the notice of appeal entered in this case by Anchor Glass. Thus, Trend is not a party to this appeal. In April 1996, Riley settled its claims in the district court against Trend, and the court entered an order dismissing Trend as a defendant.

Agreement and the Settlement Agreement against using Riley's molds as a template to make new molds, and for violating the Settlement Agreement's prohibition against using Riley's injection molds.

III. Unjust enrichment - for misappropriating Riley's trade secrets in the design of the spigots and other component parts.

IV. Common law trade dress infringement and unfair competition - for using trade dress on sun tea jars and spigots confusingly similar to Riley's trade dress.

V. Misappropriation of trade secrets - for misappropriating Riley's trade secrets in the design of the spigots.

VI. Conversion - for making unauthorized use of Riley's molds.

VII. Conspiracy - for conspiring to convert Riley's property and its trade secrets in its molds.

VIII. Tortious inference - against Anchor Glass, for interfering with Riley's distinct contractual relationship with Trend Plastics, and against Trend Plastics, for interfering with Riley's distinct contractual relationship with Anchor Glass.

In addition to money damages, including punitive and treble damages, Riley also sought preliminary and permanent injunctive relief.

Anchor Glass responded to Riley's complaint by filing a motion to dismiss or stay the suit pending arbitration, invoking the arbitration clause of the Manufacturing Agreement. The district court took up this motion at a scheduling conference, ruling that the broad language of the release in the Settlement Agreement released any obligation of Riley found in the Manufacturing Agreement to submit its claims to arbitration. The court also cited the merger clause of the Settlement Agreement as "buttressing" its conclusion. The court said the language of the release and merger clauses was unambiguous, and because of the clarity of this contract interpretation, there was no need to discuss

the federal common law of arbitrability decisions under the Federal Arbitration Act.

The appeal is properly before us, and we have appellate jurisdiction over Anchor Glass' interlocutory appeal under 9 U.S.C. § 16(a)(1)(A) (1994) and Fed. R. App. P. 4(a).

**Discussion**

We review de novo a district court's order denying a stay of a federal suit pending arbitration pursuant to 9 U.S.C. § 3.  See Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1283 (10th Cir. 1997).  This review requires us to evaluate whether the district court correctly found that no valid and enforceable agreement to arbitrate the parties' dispute exists.  See Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1513 (10th Cir. 1995).  Because the district court rendered its decision on the pleadings, for the purposes of this appeal we must accept Riley's factual averments in its complaint as true.  See Lee v. Gallup Auto Sales, Inc., 135 F.3d 1359, 1362 (10th Cir. 1998).

I.  Existence of an agreement to arbitrate

This case presents a situation where two commercially sophisticated parties disagree over the arbitrability of their dispute in light of their contractual history,

- 10 -

where they agreed at first to a broad arbitration clause and then arguably canceled or narrowed that arbitration clause in a subsequent agreement. Before we address the specific arbitrability of the claims raised by Riley in its federal suit, we must address the threshold issue of who decides arbitrability in the first place – the courts or an arbitrator.

### A.  Federal court jurisdiction to decide issues of arbitrability

Under the Federal Arbitration Act ("FAA"), courts have developed a federal common law of arbitrability that implements Congress' expression of a strong national policy favoring the resolution of commercial disputes through arbitration. See Allied-Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270-71 (1995). Under this law, "the question of arbitrability – whether a [contract] creates a duty for the parties to arbitrate the particular grievance – is undeniably an issue for judicial determination. Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." AT&T Techns. v. Communication Workers, 475 U.S. 643, 649 (1986).

Unlike the general presumption that a particular issue is arbitrable when the existence of an arbitration agreement is not in dispute, see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983), when the dispute is

whether there is a valid and enforceable arbitration agreement in the first place,

the presumption of arbitrability falls away.  See First Options of Chicago, Inc. v.

Kaplan, 514 U.S. 938, 944-45 (1995).  As the Court explained,

> Courts should not assume that the parties agreed to
> arbitrate arbitrability unless there is "clear and
> unmistakable" evidence that they did so.  In this manner,
> the law treats silence or ambiguity about the question
> "who (primarily) should decide arbitrability" differently
> from the way it treats silence or ambiguity about the
> question "whether a particular merits-related dispute is
> arbitrable because it is within the scope of a valid
> arbitration agreement" – for in respect to this latter
> question the law reverses the presumption.

Id. (citations omitted); see also Cogswell v. Merrill Lynch, Pierce, Fenner &

Smith Inc., 78 F.3d 474, 480 (10th Cir. 1996).  Courts will not apply the

traditional presumption in favor of arbitrability when the particular issue is

whether the parties have agreed to allow an arbitrator to decide the existence of

their putative agreement to arbitrate because "doing so might . . . force unwilling

parties to arbitrate a matter they reasonably would have thought a judge, not an

arbitrator, would decide."  First Options, 514 U.S. at 945.  Furthermore, "the

issue is not whether it would be more convenient for courts or arbitrators to

decide" whether the parties have a valid and enforceable agreement to arbitrate,

but rather "whether the parties' agreement contains 'clear and unmistakable'

evidence they intended the arbitrator to decide the issue." Cogswell, 78 F.3d at 481.

### B.  Evidence as to the "Who decides" issue in the Riley-Anchor Glass arbitration clause

In light of the difficult arguments that Anchor Glass must present to support its initial arbitrability argument, we have no hesitation in concluding that Anchor Glass does not have "clear and unmistakable" evidence that the parties intended to have an arbitrator, rather than a court, decide whether an arbitration agreement exists or what the scope of that agreement is.  Thus, the validity and enforceability of the Riley-Anchor Glass arbitration agreement is for the courts to decide.  As a result, we conclude that there was no error in the district court's decision to resolve the arbitrability issue itself rather than to refer it to an arbitrator.

First, although the arbitration clause in the Manufacturing Agreement is broadly written, referring to "any and all disputes arising out of or relating to" the contract, there is no hint in the text of the clause or elsewhere in the contract that the parties expressed a specific intent to submit to an arbitrator the question whether an agreement to arbitrate exists or remained in existence after the Settlement Agreement.  Furthermore, Riley and Anchor Glass negotiated against

background principles of Florida and Kansas law,[5] where the issue of arbitrability has been determined, as a matter of law, to be a question for the courts and not an arbitrator. For example, in Florida, in a case involving one party's claim that a subsequent oral contract had superseded an earlier written arbitration agreement, the court held that the question of "[w]hether or not a dispute should be submitted to arbitration is <u>a question for the court</u> to determine from the contract of the parties. . . . [T]he trial court cannot leave it to the arbitrators themselves to determine which claims are subject to arbitration when it has not established which agreement applies." <u>Thomas W. Ward & Assoc., Inc. v. Spinks</u>, 574 So.2d 169, 169-70 (Fla. Ct. App. 1990) (emphasis added & citation omitted). Similarly, in Kansas, the law is long-established that "whenever a motion to compel arbitration comes on for hearing, the threshold determination <u>to be made by the court</u> is whether an agreement to arbitrate exists and whether this agreement includes arbitration of the specific point at issue." <u>City of Wamego v. L.R. Foy Constr. Co.</u>, 675 P.2d 912, 915 (Kan. Ct. App. 1984) (emphasis added). We find

---

[5]The Manufacturing Agreement specifies that the contract is to be "construed under and in accordance with the laws of the State of Florida." The parties, however, relied on Kansas decisional law for purposes of this appeal. In any event, because the question here is the intent of the parties, we believe that both Kansas and Florida law provide evidence of the parties' unstated assumptions about how the law would treat their contract. See <u>First Options</u>, 514 U.S. at 944 ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

no "clear and unmistakable evidence" within the four corners of the Manufacturing Agreement that the parties intended to submit the question of whether an agreement to arbitrate exists to an arbitrator.

Second, the existence of the merger clause in the Settlement Agreement raises at least an ambiguity on the question of the intent of the parties to allow an arbitrator to decide the validity of the 1991 arbitration clause. The merger clause expressly states that the Settlement Agreement "cancels, terminates and supersedes" any prior agreement relating to the subject matter of the Manufacturing Agreement. Although we conclude below that this language does not terminate the arbitration clause in the Manufacturing Agreement in toto, see Part II infra, we do believe that this language raises legitimate questions as to the continuing existence and scope of the arbitration clause in the Manufacturing Agreement. Furthermore, the Settlement Agreement is noteworthy for its lack of an arbitration clause. Thus, because the Settlement Agreement creates an ambiguity on the question of arbitrability – an ambiguity that the Settlement Agreement does not expressly delegate to an arbitrator for resolution – we find that the question of whether an agreement to arbitrate continues to exist for Riley and Anchor Glass is a question for the courts.

## II. Existence and scope of an agreement to arbitrate

The district court determined that the arbitration clause in the Manufacturing Agreement no longer held any force or effect in the face of the Settlement Agreement. The court relied on two rationales, first that the mutual release clause in the Settlement Agreement "exonerated Riley from any duty with respect to binding arbitration of disputes arising out of or relating to the Manufacturing Agreement," and second that the merger clause in the Settlement Agreement canceled the arbitration provisions of the Manufacturing Agreement. We disagree on both issues.

Under the federal common law of arbitrability, an arbitration provision in a contract is presumed to survive the expiration of that contract unless there is some express or implied evidence that the parties intend to override this presumption: "In short, where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication." Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionery Workers Union, 430 U.S. 243, 255 (1977). Thus, when a dispute arises under an expired contract that contained a broad arbitration provision, courts must presume that the parties intended to arbitrate their dispute. This is so even if the facts of the dispute occurred after the contract expired. See id. (holding that claims for severance pay by workers who were discharged after their collective bargaining

agreement expired were subject to the continuing force of the prior arbitration clause). The presumption in favor of continuing arbitrability, however, disappears in either of two situations: first, if the parties express or clearly imply an intent to repudiate post-expiration arbitrability, and second, if the dispute cannot be said to arise under the previous contract. See id. at 254-55; United Food & Commercial Workers Int'l Union v. Gold Star Sausage Co., 897 F.2d 1022, 1026 (10th Cir. 1990); see also Primex Int'l Corp. v. Wal-Mart Stores, Inc., 679 N.E.2d 624, 626 (N.Y. 1997) (holding that commercial disputes relating to two expired contracts were arbitrable, but any portion of the disputes relating to the last contract between the parties, which lacked an arbitration clause, was not arbitrable). In United Food, we defined the concept of whether a dispute "arises under" a previous contract as follows: "a dispute must either involve rights which to some degree have vested or accrued during the life of the contract and merely ripened after termination, or relate to events which have occurred at least in part while the agreement was still in effect." United Food, 897 F.2d at 1024-25 (quotation omitted).

The lesson we take from these cases is that absent some evidence that Riley and Anchor Glass intended to revoke the arbitration clause in their Manufacturing Agreement, that agreement to arbitrate disputes continues to exist and to apply to certain disputes between Anchor Glass and Riley. However, the arbitration clause

- 17 -

in the Manufacturing Agreement only applies to disputes that "arise under" that Manufacturing Agreement and its successor agreements. The obligation to arbitrate cannot apply to claims or defenses that relate to matters that do not arise under the Manufacturing Agreement. With this understanding in mind, we now turn to the evidence that Riley and the district court found demonstrates an intent to revoke the arbitration clause in the Manufacturing Agreement.

### A.  Effect of the 1995 mutual release clause

The core rationale for the district court's decision was its conclusion that the mutual release clause in the Settlement Agreement eliminated <u>all</u> of Riley's duties under the Manufacturing Agreement. If this conclusion were correct, we would agree that the claims herein asserted could not arise under the Manufacturing Agreement and hence would not be arbitrable. However, the view that the Settlement Agreement terminated all of Riley's duties fails to account for the precisely limited nature of the release provisions in the Settlement Agreement.

After wading through the boilerplate in ¶ 5.3 of the Settlement Agreement, it becomes clear that Anchor Glass released Riley from only five discrete matters, none of which included Riley's obligation under the Manufacturing Agreement to arbitrate matters which arise under the Manufacturing Agreement and are not settled in the Settlement Agreement. Thus, Riley was released from:

- 18 -

1) Anchor's claims or defenses raised in Riley's first threatened copyright litigation in 1995;

2) Anchor's claims upon Riley's indebtedness evidenced by the Manufacturing Agreement and the promissory note and security agreement executed contemporaneously thereto, which claims are described in ¶ 3.2 of the Settlement Agreement;[6]

3) Anchor's claim for the unfilled portion of an order of approximately 5 million tumblers to be produced by Riley;

4) Anchor's claim that Riley pay for advertising related to the "Waukama" order; and

---

[6]The language of ¶ 5.3(i) on this point is syntactically incorrect, but we believe that the intent of the parties here was to refer to Riley's commercial indebtedness to Anchor Glass.

Paragraph 5.3(i), as written, refers to "any Anchor claims arising under the Manufacturing Agreement between the parties referenced in ¶ 3.2 and all other agreements or documents executed in connection therewith." This syntactical structure suggests the citation to ¶ 3.2 merely specifies which parties are being discussed. However, ¶ 3.2 does not define the parties in the dispute; instead, the paragraph discusses Riley's existing commercial debts to Anchor Glass.

We believe the correct reading of the release in ¶ 5.3(i) construes the phrase "referenced in ¶ 3.2" to modify "claims" rather than "parties." Because our review of the legal meaning of this contract is de novo, we respectfully disagree with the district court's contrary interpretation, which would apparently have had the phrase "referenced in ¶ 3.2" modify "parties." Although there is certainly syntactical support for that conclusion, there was no issue in ¶ 5.3 concerning which parties are referenced. Paragraph 5.3 defines explicitly the parties covered by the paragraph, and it would make no sense to assume there was a further identification of the parties referenced in that paragraph by referring back to ¶ 3.2, which does define certain claims but does not define parties.

- 19 -

5) Anchor's claim for an allegedly short shipment of seconds delivered to Anchor by Riley at Columbus, Ohio.

In light of these limited releases, we conclude that ¶ 5.3 of the Settlement Agreement does not destroy all of Anchor Glass' rights to demand arbitration for disputes with Riley. Instead, the specific releases in ¶ 5.3 only go so far as to waive Anchor Glass' right to demand arbitration on the five topics explicitly listed (together, of course, with a waiver of Anchor Glass' underlying claim on the merits pertaining to those five topics, no matter what forum might be used to assert such rights). Thus, under the Settlement Agreement, Anchor Glass continues to possess the right to demand arbitration on disputes unrelated to the five topics listed in ¶ 5.3.

## B. Effect of the merger clause in the Settlement Agreement

Although we believe that the waiver and release provisions of ¶ 5.3 leave untouched certain of Anchor Glass' claims and the right to demand arbitration on such claims, we must still address the district court's alternative conclusion that the merger clause in ¶ 8.2 of the Settlement Agreement "cancels, terminates and supersedes" the entirety of the Manufacturing Agreement. However, on this point too, we conclude that the district court construed the Settlement Agreement too broadly.

Paragraph 8.2 in the Settlement Agreement reads as follows: "This Agreement constitutes the entire agreement of the parties hereto and cancels, terminates and supersedes any and all prior representations and agreements relating to the subject matter hereof." Anchor Glass argued below that the "subject matter" of the Settlement Agreement was limited solely to Riley's threatened copyright suit. The district court characterized this argument as "myopic," and we agree that the "subject matter" of the Settlement Agreement is not so severely limited. Indeed, if the subject matter of the Settlement Agreement related only to the copyright dispute, then there would have been no basis for releasing Riley's commercial debts or other specific claims listed in ¶ 5.3 and discussed in the preceding section of this opinion.

On the other hand, we reject Riley's equally extreme position that the "subject matter" specified in ¶ 8.2 is the entire business relationship between Riley and Anchor Glass, including the entire Manufacturing Agreement. If the Settlement Agreement had intended to extinguish the entire Manufacturing Agreement, it would be expected that it would have said so explicitly. But there is no such explicit statement in the Settlement Agreement. Indeed, if the Manufacturing Agreement were null and void as a result of the merger clause in the Settlement Agreement, Riley would have lost some very important protections provided to it by the Manufacturing Agreement. For example, § 18 of the

Manufacturing Agreement specifies that Anchor Glass will not have the power to "contest the validity or ownership of the Riley trademark during or after the term of this Agreement." This is a valuable right for Riley, and we think it unlikely that Riley intended to give up this right sub silentio when it listed other rights it was giving up with specificity in ¶ 5.1. This is especially so when there are no references whatsoever to the trademark rights or the incontestability of Riley's marks in the Settlement Agreement.

Instead of Riley's contention that the Settlement Agreement superseded all of the Manufacturing Agreement, we conclude that the merger clause in the Settlement Agreement cancels only those provisions of the Manufacturing Agreement that related to the specific "subject matter" of the Settlement Agreement. Therefore, in order to determine the scope of the merger clause in ¶ 8.2, we must identify the "subject matter" of the Settlement Agreement.

First, the initial "whereas" clauses of the Settlement Agreement make it clear that the "subject matter" of the Settlement Agreement includes the copyright litigation that Riley had threatened against Anchor Glass. However, it would not be accurate to say that the Settlement Agreement pertains to any and all copyright disputes between Riley and Anchor Glass, even future disputes. Rather, the copyright issues raised in the Settlement Agreement relate to Riley's infringement claims against Anchor Glass for four specific ornamental designs. The only other

provision relating to copyright rights in the Settlement Agreement involves Anchor Glass' promise in ¶ 2.6 to return to Riley all copies of the Riley-copyrighted designs that Anchor Glass had been using in its production of sun tea jars. This provision appears to touch, at least peripherally, on the language in the Manufacturing Agreement specifying that Riley will reacquire its copyright rights over its decorative designs when the Manufacturing Agreement expires. Thus, the "subject matter" of the Settlement Agreement appears to involve both the specific copyrighted designs at issue in Riley's first threatened lawsuit as well as Anchor Glass' continuing use of Riley's copyrighted designs.

Second, ¶¶ 2.4 and 2.5 of the Settlement Agreement also make very specific references to Anchor Glass' future use of Riley's injection molds. The Settlement Agreement spells out that Anchor Glass would be allowed to use Riley's injection molds for the 1995 season but would be expected to develop its own molds for the 1996 season. Furthermore, if Anchor Glass used Riley's molds in 1996, Anchor Glass would be required to pay Riley a royalty of 5 cents for each plastic part made from the molds. These provisions in the Settlement Agreement directly conflict with, and therefore supersede, the language in the termination clause of the Manufacturing Agreement, which specifies that "Anchor shall not have the right to use . . . Riley's injection molds." Thus, the "subject matter" of the 1995 contract also includes Anchor Glass' continuing use of Riley's injection molds.

Third, the Settlement Agreement in ¶ 4.2 reestablishes a production-distribution relationship between Riley and Anchor Glass in which Anchor Glass guaranteed that it would order at least 43 truckloads of Riley's sun tea containers for both the 1996 and 1997 seasons. This portion of the Settlement Agreement also established a new pricing schedule for Riley's products. Thus, the "subject matter" of the Settlement Agreement also includes the essential business relationship between Riley and Anchor Glass for the 1996 and 1997 sun tea seasons.

Fourth, ¶ 3.1 of the Settlement Agreement reallocates the financial relationship between Riley and Anchor Glass, with Anchor Glass agreeing to forgive Riley's debts under their prior contracts and to make additional payments to Riley. Thus, the "subject matter" of the 1995 contract includes how the parties intend to resolve their financial obligations stemming from the 1991 contract.

Finally, ¶ 3.4 of the Settlement Agreement includes a mutual promise from the parties that they will refrain from "unlawful economic reprisals or retribution" against each other. The contract does not specify what is meant by "reprisal" and "retribution." Nevertheless, this provision makes clear that the "subject matter" of the 1995 contract included how the parties henceforth were to deal with each other.

The merger clause in the Settlement Agreement revoked the prior right of

the parties to demand arbitration on these specific topics.[7]  However, nowhere does the Settlement Agreement affect the right of the parties to demand arbitration on topics unrelated to the enumerated "subject matter" of the Settlement Agreement.  The parties also continue to retain a right to demand arbitration on any legal defenses that arise solely from the provisions of the Manufacturing Agreement and not released by the Settlement Agreement.

### C.  Anchor Glass' limited right to demand arbitration

In light of our discussion above on the "subject matter" of the Settlement Agreement, we conclude that Anchor Glass retains a limited right to demand arbitration on those claims in Riley's federal lawsuit that arise under the Manufacturing Agreement but which are not addressed in the Settlement Agreement. With some of Riley's claims, we have no hesitation in resolving whether or not they are subject to arbitration.  Others of Riley's claims, however, are not so clear and we cannot discern with confidence whether they either arise under the Manufacturing Agreement or are addressed in the Settlement Agreement, and thus are removed from the arbitration provision.  As a result, we

---

[7]We do not necessarily intend to conclude that this is an exhaustive list, but merely set forth the above topics to demonstrate that the "subject matter" of the Settlement Agreement is expressly set forth and may be discerned from the various substantive provisions found in the document.

must remand this case to the district court for further proceedings to determine whether there is any implicit evidence in the record indicating that these claims relate to the 1995 contract.

For example, as for Riley's copyright claim in Count I of the suit, there can be no question that this claim is not subject to arbitration. Riley's pleadings indicate that this claim involves three of the four copyrighted designs that were the subject of Anchor Glass' release in the 1995 Settlement Agreement. (Compare Aplt. App. at 18, ¶ 52 with id. at 68 (First "whereas" clause).) As a result, Count I of Riley's suit clearly relates to the "subject matter" of the 1995 contract. The district court did not err in refusing to stay Riley's case pending arbitration of this claim.

On the other hand, it appears that at least a portion of Riley's breach of contract claim, ("Anchor used Riley's molds as a template to make its molds in breach of the Manufacturing Agreement . . . ," see ¶ 58 of the Complaint), may still be subject to arbitration since that claim, specifically limited to the Manufacturing Agreement, does not appear to have been released or otherwise affected by the Settlement Agreement.

As for Riley's other counts in this case, though, we have no way of determining from the record before us whether the factual support for these claims arises under the Manufacturing Agreement and whether they relate to the

"subject matter" of the Settlement Agreement. The parties have not briefed which specific claims would be subject to arbitration in light of our interpretation of the "subject matter" of the Settlement Agreement. Thus, on remand, the district court should review Riley's pleadings and the positions of the parties to determine which of those claims in Riley's suit are related to the "subject matter" of the Settlement Agreement and therefore are not eligible for arbitration under the Manufacturing Agreement. In conducting this review, the district court must bear in mind the rule that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." See Moses H. Cone, 460 U.S. at 24-25.

After conducting this review of Riley's claims, the district court also should make an additional determination of whether a resolution of Riley's arbitrable claims will have a preclusive effect on the nonarbitrable claims that remain subject to litigation. If there will be such a preclusive effect, especially if the arbitrable claims predominate over the nonarbitrable claims, then the district court should consider whether to stay the federal-court litigation of the nonarbitrable claims pending the arbitration outcome on the arbitrable claims. See Genesco, Inc. v. T. Kakiuchi & Co., 815 F.2d 840, 856 (2d Cir. 1987) (holding that "[b]road stay orders are particularly appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit"). On the other hand, the mere fact that piecemeal litigation results from

the combination of arbitrable and nonarbitrable issues is not reason enough to stay Riley's entire case.  See Coors Brewing Co. v. Molson Breweries, 51 F.3d 1511, 1517 (10th Cir. 1995) (holding that "litigation must proceed in a 'piecemeal' fashion if the parties intended that some matters, but not others, be arbitrated").

## Conclusion

The district court correctly determined that the initial question of the arbitrability of the appellee's claims was for the courts to decide rather than an arbitrator.  However, the court erred in determining that the appellant had no right to demand arbitration on any of the claims asserted in this case.  Instead, we hold that the appellant has a limited right to demand arbitration on those claims arising under the Manufacturing Agreement but unrelated to the matters modified or otherwise addressed in the Settlement Agreement.

As a result, we REVERSE the district court's decision in its Scheduling Order of August 28, 1996, denying the appellant's motion for a stay pending arbitration, and we REMAND for further proceedings in light of our discussion above.