1MAGE SOFTWARE, INC., a Colorado corporation, Plaintiff,

v.

THE REYNOLDS AND REYNOLDS COMPANY, an Ohio corporation, et al. Defendants.

No. CIV.A. 02–K–1688.

United States District Court, D. Colorado.

July 23, 2003.

James A. Jablonski, Gorsuch, Kirgis, LLP, Denver, CO, for 1mage Software, Inc.

JoAnne M. Zboyan, Denver, CO, for Reynolds and Reynolds Co.

Peter H. Walsh, Hogan & Hartson, Denver, CO, for Auto Dealer, defendants.

## ORDER GRANTING MOTION TO COMPEL ARBITRATION AND FOR STAY

KANE, District Judge.

This computer software copyright and trade secrets action is before me on Defendant Reynolds' Motion to Compel Compliance with Alternative Dispute Resolution Provision ("Motion to Compel Arbitration") and the Motions of both Reynolds and the remaining Auto Dealer Defendants for Stay pending arbitration. Reynolds asserts Plaintiff's claims "arise under" the parties' 1994 Software Licensing Agreement and that they are therefore subject to arbitration under that Agreement's arbitration clause. I agree, and grant the Motion to Compel Arbitration and related Motions for Stay.

### I. *BACKGROUND.*

Plaintiff 1mage Software, Inc. ("1mage"), is a developer of computer imaging software used to capture and archive business reports and paper documents as electronic images. The software eliminates the need to handle original paper documents such as sales tax returns, payroll reports, and repair orders. Defendant Reynolds & Reynolds Co., ("Reynolds") is an Ohio corporation in the business of supplying business forms to the automotive industry since 1927. Pursuant to a 1994 Software Licensing Agreement executed with 1mage's parent company, ISI, (the "1994 Licensing Agreement"), Reynolds purchased perpetual exclusive and non-exclusive licenses to Plaintiff's "1MAGE" software (defined in the Agreement as the "ISI Software") and certain related third-party applications ("Third-Party Software") in exchange for a one-time fee of $1.75 million. The Agreement provided that "[s]ubsequent updates, upgrades, enhancements and new products provided by ISI will be made available to

Reynolds and become a part of the ISI Software and Documentation, provided the fees ... are agreed upon by the parties at that time." 1994 Licensing Agreement § 5.2. The remaining Defendants are Denver area automobile dealerships (the "Auto Dealer Defendants") who are using a disputed version of 1MAGE pursuant to sublicensing agreements with Reynolds.

Section 18 of the parties' 1994 Licensing Agreement includes an alternative dispute resolution provision calling for the arbitration of "any dispute ... arising out of or related to this Agreement ... whether in contract, tort or otherwise." The dispute in this case is 1mage's claim that the perpetual license provided under the 1994 Agreement was limited to 1MAGE Release 3.3 and related software, so that when the parties in 1996 entered into a subscription and maintenance agreement for 1MAGE Release 5.5 (the "1MAGE ™ Document Management System Maintenance Agreement" or "1996 Agreement"), a new and separate license related solely to 1MAGE Release 5.5 arose.[1] This separate license, according to 1mage, was completely independent of the perpetual license granted in 1994 and conditioned the initial transfer and authorization to use Release 5.5 on payment of the AMC. When Reynolds terminated the 1996 Agreement in April 2002 and ceased paying the annual fee, 1mage contends Reynolds' license to use Release 5.5 ended with it. Reynolds' continued use and distribution of Release 5.5 to the Auto Dealer Defendants thereafter, 1mage concludes, constitutes a misappropriation of trade secrets and infringes 1mage's copy-rights in the 1MAGE software. On the assertion that Reynolds' use of the 1996 Software is governed exclusively by the 1996 Agreement, which includes no alternative dispute resolution provision, 1mage maintains the dispute is properly before this Court and is not subject to arbitration.

Reynolds denies the 1996 Agreement included any license grant or affected in any way its right to use the disputed 1996 Software, which it claims was a "subsequent update, upgrade, [or] enhancement" of the ISI Software under § 5.2 of the 1994 Licensing Agreement and therefore within the scope of the perpetual license. Reynolds maintains the 1996 Agreement was nothing more than a subscription-based agreement for the servicing and upkeep of 1MAGE and related software, which it could renew or terminate without any impact on the underlying license.

Whatever the merits, Reynolds contends the dispute over ownership rights to the 1996 Software is one "arising under" the 1994 Licensing Agreement and therefore subject to arbitration. I agree. Resolution of 1mage's copyright infringement claim is only a necessary consequence of determining the private contractual rights of the parties, i.e., whether the 1996 Agreement gave rise to a new license for Reynolds' use of 1MAGE Release 5.5 independent of the perpetual license conferred in 1994 or merely established new terms for the maintenance and upkeep of a later version of 1MAGE that, by operation of § 5.2 of the original Agreement, had become part of the "ISI Software" for which Reynolds already had a license.[2] That

---

1. Because the 1996 Agreement contemplates the provision of *"subscription* and maintenance service" and because the Annual Maintenance Charge (AMC) is defined in Schedule 1 of the Agreement as "$175,000 plus a $250 *subscription* fee for each licensee" (emphasis added), 1mage maintains it gave rise to a completely independent subscription license payable and renewable annually.

2. A third scenario, also contingent on principles of contract interpretation, might be that the 1996 Agreement established the "fees" pursuant to which the later version of 1MAGE was "made available" to Reynolds under § 5.2 of the 1994 Agreement, such that Reynolds' "perpetual" license to use the software was contingent on the paying of that fee.

interpretation must be discerned by the application of common law principles of contract construction. No construction of the federal Copyright Act or consideration of federal public policy principles is necessary to its resolution.

█ Both parties' positions on the merits of their claims and defenses appear viable. In deciding whether the parties have agreed to submit the dispute to arbitration, however, the actual merits of those claims and defenses are irrelevant. *See AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 651, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)("in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims"). The question is not whether the 1994 Licensing Agreement was limited to 1MAGE Release 3.3 and the 1996 Agreement evinced an intent to create a different and limited license to use Release 5.5 that ended upon termination of that Agreement, but whether the facts underlying 1mage's copyright infringement and misappropriation of trade secret claims arise under or relate to the 1994 Licensing Agreement. Because the parties' licensing relationship over Plaintiff's 1MAGE software began in 1994 with a formal and individually negotiated Licensing Agreement and continued, in some form at least, notwithstanding the 1996 Agreement's origin or termination,[3] I find that they do.

## II. DISCUSSION.

### A. Jurisdiction.

Federal jurisdiction over the instant dispute is premised both on diversity of citizenship under 28 U.S.C. § 1331 and the fact the first of Plaintiff's two claims "arises under" the federal Copyright Act of 1976 for purposes of 28 U.S.C. § 1338(a). The standard for federal jurisdiction under § 1338(a) is minimal, requiring only that plaintiff seek a remedy expressly provided under the Act. *See Bassett v. Mashantucket Pequot Tribe,* 204 F.3d 343, 348–49 (2d Cir.2000)(citing *T.B. Harms Co. v. Eliscu,* 339 F.2d 823 (2d Cir.1964)(Friendly, J.)). It is not necessary that plaintiff's copyright claim require any construction of the Act or federal law generally. *Id.* Because the remedy sought by 1mage includes Reynolds' profits or statutory damages as provided under the Act, jurisdiction under § 1338(a) is established.

### B. Legal Standards.

█ The Federal Arbitration Act (FAA), 9 U.S.C. § 1–16, "evinces a strong federal policy in favor of arbitration." *ARW Exploration Corp. v. Aguirre,* 45 F.3d 1455, 1462 (10th Cir.1995)(citing *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 226, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987)), *cert. denied,* 525 U.S. 822, 119 S.Ct. 65, 142 L.Ed.2d 51 (1998). The purpose of the FAA "was to reverse the longstanding judicial hostility to arbitration agreements ... and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.,* 500 U.S. 20, 24, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). "If a contract contains an arbitration clause, a presumption of arbitrability arises." *ARW* at 1462. This presumption may be overcome only if "it may be said with positive assurance that the arbitration clause is not susceptible of an interpreta-

---

3. The integration clause of the 1996 Maintenance Agreement included a handwritten interlineation providing that the Agreement constituted the exclusive statement of the entire agreement between them and supersedes all prior oral or written representations or agreements between them *"except the Software Licensing Agreement dated May 4, 1994, between Information Solutions, Inc. and Purchaser."*

tion that covers the asserted dispute." *Id.* All doubts should be resolved in favor of coverage. *Id.* As the Supreme Court stated in *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983):

> The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, *or a like defense to arbitrability.*

(Emphasis added.)

■ Here, the arbitration clause at issue is found in the parties' original 1994 Licensing Agreement. The presumption, then, is that 1mage's claim that Reynolds is using 1mage software for which it no longer owns a license is subject to arbitration under that Agreement. 1mage's defense to arbitrability is that Reynolds right to use the particular version of 1mage software at issue is governed by the 1996 Maintenance Agreement, which does not have an arbitration clause. Because the underlying source of Reynolds' rights to use 1mage software generally originated in the 1994 Agreement and because the 1996 Agreement expressly acknowledged the 1994 Agreement's continuing viability after its execution, the presumption, again, is that 1mage's claim that Reynolds is using 1mage software without authorization is subject to arbitration. Under *Moses H. Cone,* moreover, any doubt that the dispute is not subject to arbitration should be resolved in favor of arbitration.

It has been argued that certain disputes founded on statutory rights, by their very nature, involve public policies or interests rendering them "non-arbitrable" as a matter of law. *See LDS, Inc. v. Metro Canada Logistics, Inc.,* 28 F.Supp.2d 1297, 1300 (D.Kan.1998)(claim under Copyright Act)(citing *Gilmer v. Interstate/Johnson*

*Lane Corp.,* 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991)(claim under Age Discrimination in Employment Act); *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989)(claims arising under the Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon,* 482 U.S. 220, 107 S.Ct. 2332, 96 L.Ed.2d 185 (1987) (claim under § 10(b) of the Securities Exchange Act of 1934 and claim under civil provisions of the Racketeer Influenced and Corrupt Organizations Act); and *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)(claim under Sherman Antitrust Act)). This argument has been largely rejected, with the Supreme Court upholding the enforceability of arbitration agreements under the FAA in connection with the identified claims. *See id.* In *LDS,* the Court relied on these cases as well as the Tenth Circuit's decision in *Coors Brewing Co. v. Molson Breweries,* 51 F.3d 1511 (10th Cir. 1995) to reject plaintiff's contention that a claim for copyright infringement involves, per se, "non-arbitrable" subject matter. 28 F.Supp.2d at 1300–01 (finding it was plaintiff's burden to demonstrate Congress intended to preclude a waiver of judicial remedies for copyright infringement claims and concluding plaintiff could not do so). *See generally* 3 Nimmer on Copyright, § 10.15[B] at pp. 10–128—10–130 (Lexis/Nexis 2002)(citing *Saturday Evening Post Co. v. Rumbleseat Press, Inc.,* 816 F.2d 1191, 1199(7th Cir.1987)(holding federal law does not forbid arbitration of the validity of a copyright)).

That does not mean, however, that all copyright claims are subject to arbitration or that all broadly worded arbitration provisions are susceptible to an interpretation that includes them. *See* Nimmer, *supra,* at 10–128—10–129. In *Desktop Images, Inc. v. Ames,* 929 F.Supp. 1339, 1344–45

(D.Colo.1996), for example, I determined the parties' agreement to arbitrate "any disputes or questions arising [under the agreement] including the construction or application of the Agreement" did not include plaintiff's claim for copyright infringement that was premised on a licensee's unauthorized copying, modification and reselling of plaintiff's tutorial video under its own label. Relying on the distinction drawn by Professor Nimmer between infringement claims premised on ownership rights allocated by contract and those that must be substantively construed under the Act, I reasoned the question to be asked in a given case was " 'where … the rights and obligations [that] control the resolution of the dispute arise.' " *Id.* at 1345 (quoting *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Thomson*, 574 F.Supp. 1472, 1475 (E.D.Mo.1983)). Finding the rights and obligations controlling the *Desktop* plaintiff's entitlement to a remedy for defendant's actions in "passing off" plaintiff's copyrighted videos as its own arose under the Copyright Act rather than the parties' licensing agreement, I concluded the licensing agreement's arbitration clause did not reflect an intention to arbitrate such a claim. *Id.*

### C. *Arbitrability of 1mage's Copyright Claims in this Case.*

Applying these standards, the question in the instant case is two-fold: (1) whether the rights and obligations controlling resolution of 1mage's misappropriation and copyright claims arise chiefly under the Copyright Act or under the parties' licensing agreement(s); and (2) whether it can it be said with positive assurance that the arbitration clause at § 18 of the parties' 1994 Licensing Agreement is not susceptible to an interpretation that covers those claims.

The answer to the first question is clearly that the rights and obligations governing the resolution of whether Reynolds' continuing use of IMAGE Release 5.5 is unlawful or not arise under the Agreements governing Reynold's rights to use and distribute 1mage software rather than under the Copyright Act or federal common law. Reynolds' actions did not impact or infringe on the substantive property rights acquired by 1mage under the Act as did the actions of the defendant in *Desktop*, and the merits both of 1mage's claim that Reynolds' use of Release 5.5 is unlawful, as well as Reynolds' defense that it is not, turn solely on the construction of the parties' contract rights under the 1994 and 1996 Agreements. Under these circumstances, the nature of 1mage's claims under the Copyright Act do not preclude their referral for arbitration under an appropriate arbitration clause and I proceed to the second inquiry of whether the particular arbitration provision at issue is not somehow susceptible to an interpretation that includes 1mage's claim.

A principal point of contention between 1mage and Reynolds in this case is the scope of the parties' 1994 Licensing Agreement generally and the application/effect of the 1996 Agreement on Reynolds' rights to use 1MAGE Release 5.5. 1mage contends the 1994 Licensing Agreement was limited to 1MAGE Release 3.3 and related third party software only, such that the 1996 Maintenance Agreement forms the sole basis for any right Reynolds has to use the later version of its software. As stated above, resolution of this dispute on its merits is irrelevant to the question at hand, namely, whether 1mage can overcome the presumption that the dispute is subject to arbitration under § 18 of the 1994 Agreement.

■ As an initial matter, an arbitration provision in a contract is presumed under the federal common law of arbitrability "to survive the expiration of that contract unless there is some express or implied

evidence that the parties intend to override this presumption." *Riley Mfg. Co. Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 781 (10th Cir.1998). In the instant case, not only is there no express or implied evidence that 1mage and Reynolds intended in their 1996 Documentation System Maintenance Agreement to override this presumption, there is both express and implied evidence that they intended it *not* to. Specifically, the 1996 Agreement, while silent on the issue of arbitration, has an integration clause that includes a handwritten, initialed interlineation that causes it to read as follows: "This Agreement is the exclusive statement of the entire agreement between 1MAGE and [Reynolds] and supersedes all prior oral or written representations or agreements between the parties *except the Software Licensing Agreement dated May 4, 1994 between Information Solutions, Inc. [ISI] and Purchaser* as to the subject matter hereof." 1996 Agreement, ¶ 11 (handwritten interlineation in italics). While 1mage's attempts to distinguish or explain away this language might ultimately prevail, they do not, at this stage of the proceedings, allow me to state with "positive assurance" that § 18 of the 1994 Agreement did not survive the signing of the 1996 Agreement.

As for the question of § 18's susceptibility to an interpretation that includes the instant dispute over licensing rights to 1MAGE Release 5.5, the answer is clearly "yes." [4] Section 1 of the 1994 Agreement defines 1MAGE Release 3.3 and "related interfaces and software" to be the "ISI Software" that is the subject of the perpetual licenses granted in §§ 3.1.1—3.1.3. Section § 5.2, in turn, provides that "[s]ub-

sequent updates, upgrades, enhancements and new products provided by ISI will be made available to Reynolds *and become a part of the ISI Software*" provided "fees" are agreed upon by the parties at that time. To the extent Reynolds can colorably argue that 1mage made Release 5.5 available to it in accordance with § 5.2 and that the 1996 Agreement's AMC constituted the "fees" pursuant to which Release 5.5 would become "part of the ISI Software," then it appears § 18 is susceptible to an interpretation that would cover that dispute. Certainly, it cannot under be said with "positive assurance" that § 18 is *not* susceptible of such an interpretation.

I conclude that the dispute between 1mage and Reynolds over Reynolds' continued use of 1MAGE Release 5.5 after its April 2002 termination of the 1996 Agreement is governed by the parties' rights and obligations in contract and therefore "arises out of" their original 1994 Licensing Agreement. Because it can only be said with "positive assurance" that both the 1994 Licensing Agreement and its § 18 are susceptible to interpretations that include the instant dispute, my ruling must be for Reynolds on its Motion to Compel Compliance with Alternative Dispute Resolution Provision and for Stay. The Motion to Compel is GRANTED, and the case STAYED pending the outcome of mediation/arbitration. The Auto Dealer Defendants' related Motion to Stay is also GRANTED.

I shall retain jurisdiction to monitor the progress of arbitration. Accordingly, the parties shall submit quarterly joint status

---

4. The relevant provision of § 18 of the 1994 Agreement is: "If any dispute occurs between the parties arising out of or related to this Agreement or its negotiation, execution or performance, whether such dispute is in contract, tort or otherwise, it will be submitted first to mediation under the mediation rules of the American Arbitration Association. Should the mediation fail, the dispute will be submitted to arbitration."

reports governing the progress of ADR efforts beginning September 1, 2003.