**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 23, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

1MAGE SOFTWARE, INC., a
Colorado corporation,

      Plaintiff - Appellant,

v.

THE REYNOLDS AND REYNOLDS
COMPANY, an Ohio corporation;
COLORADO IMPORT MOTORS
LIMITED, a Colorado corporation;
DELLENBACH CHEVROLET, INC.,
a Colorado corporation; MIKE
NAUGHTON FORD, INC., a
Colorado corporation; OWEN
FARICY MOTOR COMPANY, a
Colorado corporation; GEBHARDT
AUTOMOTIVE, INC., a Colorado
corporation; MCCADDON
OLDSMOBILE-CADILLAC, INC., a
Colorado corporation; BROADWAY
DODGE, a Colorado corporation;
FISCHER CHEVROLET, INC., a
Colorado corporation; GLENWOOD
SPRINGS MOTORS, a Colorado
corporation; KARICO, INC. (Pro-Chry
Jeep), a Colorado corporation; KORF
MOTORS, a Colorado corporation;
LUBY CHEVROLET, a Colorado
corporation; MARKLEY MOTORS, a
Colorado corporation; MEDVED
CHEVROLET, INC., a Colorado
corporation; PENKHUS MOTOR, a
Colorado corporation; ROTH

No. 04-1533

CHEVROLET, INC., a Colorado
corporation; SELLERS, INC, a
Colorado corporation; WEAVER
BEATTY, a Colorado corporation,

Defendants - Appellees.

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 02-K-1688-JLK)**

James A. Jablonski, Gorsuch Kirgis LLP, Denver, Colorado, for
Plaintiff - Appellant.

David A. Rabin, Morris, Manning & Martin, L.L.P., Atlanta, Georgia (Jo Ann M.
Zboyan, Springer & Steinberg, P.C., Denver, Colorado, and Jeffrey S. George,
Hogan & Hartson, L.L.P., Colorado Springs, Colorado, with him on the briefs),
for Defendants - Appellees.

Before **TACHA**, Chief Judge, **EBEL**, and **McCONNELL**, Circuit Judges.

**EBEL**, Circuit Judge.

1mage Software, Inc. ("1mage") appeals the district court's decision
compelling arbitration, in Ohio, of a dispute arising under a software licensing
agreement. Before reaching the merits of this appeal, we must address two
potential problems with the district court's jurisdiction. First, we conclude the
district court had subject matter jurisdiction based upon the federal question
presented by 1mage's claim asserted under the Copyright Act. In reaching this

2

conclusion, we adopt the Second Circuit's analysis for distinguishing between state-law claims alleging breach of a contract involving copyrighted matters and those asserting an actual controversy under the federal Copyright Act. Second, although this court has previously held, in <u>Ansari v. Qwest Communications Corp.</u>, 414 F.3d 1214 (10th Cir. 2005), that a district court does not have the authority under the Federal Arbitration Act (FAA"), 9 U.S.C. § 4, to compel arbitration in another district, this was not a jurisdictional prerequisite, but was instead a venue requirement that the parties have waived in this case. Reaching the merits, we AFFIRM the district court's decision to compel arbitration.

## I.    BACKGROUND[1]

1mage creates computer document imaging software used by the automotive industry. Defendant-Appellee Reynolds and Reynolds Company ("Reynolds") sought to market 1mage's software, primarily to car dealerships. To that end, 1mage and Reynolds entered into a licensing agreement on May 4, 1994 ("1994 agreement").[2] Through that agreement, 1mage granted Reynolds a perpetual license to use, market and distribute 1mage's software. The parties also agreed to arbitrate any dispute arising from this licensing agreement. Any such

---

[1]Like the district court, we rely on the undisputed allegations of the parties for these background facts.

[2]The 1994 agreement was between 1mage, its parent company, Information Software, Inc. ("ISI"), and Reynolds. The 1994 agreement's references to ISI included both ISI and 1mage.

3

arbitration was to occur in Dayton, Ohio.

Two years later, in 1996, 1mage and Reynolds entered into a "Maintenance Agreement" ("1996 agreement") for the software 1mage had licensed Reynolds to use through the previous 1994 agreement. In addition, through this 1996 agreement, Reynolds obtained a newer version of 1mage's software, Release 5.5. Although this 1996 agreement did not include an arbitration provision, it did contain a merger clause which provided that "[t]his Agreement is the exclusive statement of the entire agreement between 1MAGE and [Reynolds] and supersedes all prior oral or written representations or agreements between the parties, except the Software Licensing Agreement dated May 4, 1994." (Emphasis added.) The 1996 agreement further provided that either party could terminate that maintenance agreement with ninety days' notice to the other party. Reynolds renewed the maintenance agreement for several years by paying an annual maintenance fee, but in January 2002 it notified 1mage that it had decided to terminate the maintenance agreement effective April 21, 2002. In response, 1mage informed Reynolds that it no longer had any license to use 1mage's Release 5.5 software. When Reynolds continued using and marketing Release 5.5, 1mage sued Reynolds, along with nineteen car dealers who had obtained 1mage's software from Reynolds (collectively "Defendants"). 1mage commenced this litigation in federal court in Colorado, alleging three claims:

4

1) Defendants were infringing on 1mage's copyrighted software, in violation of the Copyright Act, 17 U.S.C. §§ 101-1332; 2) Reynolds had misappropriated 1mage's trade secrets, contrary to Colo. Rev. Stat. §§ 7-74-101 through -110; and 3) an accounting of Reynolds's revenues was needed in light of Reynolds's copyright and trade-secrets violations.

Pursuant to the Federal Arbitration Act ("FAA"), Reynolds filed a motion under 9 U.S.C. §§ 3 and 4 to stay the federal litigation and to compel arbitration of these claims.[3]  The district court granted that motion.  See 1mage Software, Inc. v. Reynolds & Reynolds Co., 273 F. Supp. 2d 1168 (D. Colo. 2003).  An arbitrator in Ohio ultimately awarded Reynolds just under $400,000 in damages.  The district court confirmed the arbitrator's judgment and award.  1mage now appeals, challenging the district court's order and jurisdiction granting Reynolds'

---

[3]The FAA provides that

> [i]f any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3.  As explained in greater detail below, § 4 sets forth the procedures by which a party can seek to enforce an agreement to arbitrate.

5

motion to compel arbitration. Having jurisdiction under 9 U.S.C. § 16(a)(3)[4] and

28 U.S.C. § 1291 to consider this appeal from the district court's final judgment,

we AFFIRM the district court's decision.

## II.    ISSUES

### A.    Whether the district court had subject matter jurisdiction.

Federal courts "have an independent obligation to determine whether

subject-matter jurisdiction exists, even in the absence of a challenge from any

party," and thus a court may sua sponte raise the question of whether there is

subject matter jurisdiction "at any stage in the litigation." Arbaugh v. Y & H

Corp., — U.S. —, 126 S. Ct. 1235, 1240, 1244 (2006). While the parties in this

case never questioned the federal courts' subject matter jurisdiction over this

action, the district court itself raised its own concern about it, but ultimately

concluded it did have subject matter jurisdiction. See 1mage Software, Inc., 273

F. Supp. 2d at 1171. After considering the issue, we agree.

#### 1.    Standard of review

This court reviews "de novo whether subject matter jurisdiction is proper in

this case." Australian Gold, Inc. v. Hatfield, 436 F.3d 1228, 1234 (10th Cir.

2006).

---

[4]9 U.S.C. § 16(a)(3) provides that "[a]n appeal may be taken from . . . a
final decision with respect to an arbitration that is subject to this title."

6

## 2.    Analysis

In its complaint, 1mage invoked the federal courts' subject matter jurisdiction under 28 U.S.C. § 1331, which provides that "[t]he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States;"[5] and 28 U.S.C. § 1338(a), which further provides that "[t]he district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks.  Such jurisdiction shall be <u>exclusive</u> of the courts of the states in patent, plant variety protection and copyright cases." (Emphasis added.)  Because the only federal-law claim 1mage alleged was its claim under the Copyright Act, the district court's subject matter jurisdiction rests solely on that claim.[6]  The district court's concern with its jurisdiction was that,

_____

[5]"A case 'arises under' federal law within the meaning of § 1331 . . . if a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law."  Empire Healthchoice Assurance, Inc. v. McVeigh, — U.S. —, 126 S. Ct. 2121, 2131 (2006) (alteration, quotations omitted).

[6]Although the district court indicated 1mage also asserted the district court had subject matter jurisdiction based on diversity, see 1mage Software, Inc., 273 F. Supp. 2d at 1171, that cannot be the case because the parties are not diverse–both 1mage and the auto dealers 1mage sued are Colorado corporations. See 28 U.S.C. § 1332(a)(1), (c)(1); see also Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1225 (10th Cir. 2004) (noting that, "to establish subject matter jurisdiction under 28 U.S.C. § 1332, a party must show that compete diversity of citizenship exists between the parties and that the amount in controversy exceeds

(continued...)

7

while 1mage pled a claim under the Copyright Act, that claim was based upon

1mage's allegations implicating the parties' 1994 and 1996 agreements. If

1mage's copyright claim was actually a state-law breach-of-contract claim that

just happened to involve copyrighted material, then it would not be sufficient to

invoke the district court's subject matter jurisdiction. See 1mage Software, Inc.,

273 F. Supp. 2d at 1171. Nevertheless, the district court concluded that it had

subject matter jurisdiction in this case because 1mage had, in its complaint,

requested a remedy "expressly provided under the [Copyright] Act." Id. In

---

[6](...continued)
$75,000"). 1mage also asserted a trade-secrets claim, but it did so under Colorado law. The district court would have had supplemental jurisdiction to consider this Colorado law claim, see 28 U.S.C. § 1367, only if it had subject matter jurisdiction in the first place. See Nicodemus v. Union Pac. Corp., 440 F.3d 1227, 1235 n.8 (10th Cir. 2006) (noting that, under 28 U.S.C. § 1367, "[i]f any one claim within Plaintiffs' complaint supports federal question jurisdiction, a federal court may assert jurisdiction over all the claims, including any alleged state-law claims, arising from the same core of operative facts"). So the question of whether the district court had subject matter jurisdiction to consider 1mage's action turns solely on 1mage's claim asserted under the federal Copyright Act.

And, although Reynolds, as a defendant, later invoked the Federal Arbitration Act, that act itself does not confer federal jurisdiction over a proceeding. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 26 n.32 (1983); U. S. Energy Corp. v. Nukem, Inc., 400 F.3d 822, 829 (10th Cir. 2005); 3 Federal Procedure, L. Ed. § 4:36 (1981); see also 13B Charles Alan Wright, et al., Federal Practice and Procedure § 3569 (2d ed. 1984). Rather, there must still be an independent basis for the district court's subject matter jurisdiction. See Moses H. Cone Mem'l Hosp., 460 U.S. at 26 n.32; see also 3 Federal Procedure, L. Ed. § 4:36; 13B Wright, et al., Federal Practice & Procedure § 3569.

8

reaching this conclusion, the district court relied on Second Circuit authority. See id. (citing Bassett v. Mashantucket Pequot Tribe, 204 F.3d 343 (2d Cir. 2000), and T.B. Harms Co. v. Eliscu, 339 F.2d 823 (2d Cir. 1964)). We agree with that authority and take this opportunity to adopt the Second Circuit's analytical approach.

The Second Circuit has set forth "[t]he most frequently cited test" for determining whether an action arises under the Copyright Act. Gener-Villar v. Adcom Group, Inc., 417 F.3d 201, 203 (1st Cir. 2005). "It is well-established that not every complaint that refers to the Copyright Act 'arises under' that law for purposes of [28 U.S.C. §] 1338(a)." Bassett, 204 F.3d at 347 (quoting 28 U.S.C. § 1338(a)). "In particular, the federal grant of a copyright has not been thought to infuse with any national interest a dispute as to ownership or contractual enforcement turning on the facts or on ordinary principles of contract law." Id. (quotations, alteration omitted).

> Whether a complaint asserting factually related copyright and contract claims "arises under" the federal copyright laws for the purposes of Section 1338(a) "poses among the knottiest procedural problems in copyright jurisprudence." 3 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 12.01[A], at 12-4 (1999). . . . Such claims characteristically arise where the defendant held a license to exploit the plaintiff's copyright, but is alleged to have forfeited the license by breaching the terms of the licensing contract and thus to infringe in any further exploitation.

9

Id.[7]

District courts in the Second Circuit had previously sought to

resolve[] the issue of jurisdiction under Section 1338 for "hybrid" claims raising both copyright and contract issues by attempting to discern whether the copyright issues constituted the "essence" of the dispute, or whether instead the copyright issues were "incidental to" the contract dispute.

. . . .

That approach, however, left a class of plaintiffs who suffered copyright infringement bereft of copyright remedies. Plaintiffs whose federal lawsuits were dismissed for lack of subject matter jurisdiction on the ground that their copyright claims were "incidental to" their contract claims had no way either to obtain an adjudication of

---

[7]In the same vein, the Ninth Circuit has noted that, although

[t]he federal courts have exclusive jurisdiction over "any civil action arising under any Act of Congress relating to . . . copyrights[,]" . . . it is well established that just because a case involves a copyright does not mean that federal subject matter jurisdiction exists. Federal courts have consistently dismissed complaints in copyright cases presenting only questions of contract law. As a result, the federal courts walk a fine line between usurping the power of the state courts and providing redress for copyright infringement. This balancing act is further complicated by the interdependence of contract and copyright claims, which can camouflage the genuine issues to be resolved.

Scholastic Entm't, Inc. v. Fox Entm't Group, Inc., 336 F.3d 982, 985-86 (9th Cir. 2003) (quoting 28 U.S.C. § 1338; citations omitted); see also 13B Charles Alan Wright, et al., Federal Practice & Procedure § 3582 ("A suit on a contract does not 'arise under' the copyright laws even though a copyright may have been the subject matter of the contract. Most disputes about ownership of a copyright do not arise under the copyright laws for purposes of jurisdiction, although there can be a different result if the case raises an important issue of interpretation of the Copyright Act.") (footnotes omitted).

10

infringement or to obtain relief provided by the Copyright Act, because the Act confers exclusive jurisdiction over copyright claims on federal courts. Such plaintiffs would be deprived of the injunctive relief, impoundment remedies, statutory damages, and attorneys fees provided by the [Copyright] Act. That approach had the added defect of requiring a [federal] court to make findings at the outset of the litigation that could not be discerned from the complaint but instead required a deep understanding of the dispute not usually gained until the case had been heard at trial.

Id. at 347-48 (citations omitted).

The Second Circuit's solution to this jurisdictional problem was to "establish[] a test . . . that focused on whether and how a complaint implicates the Copyright Act." Id. at 348. Thus, "the analysis . . . turns on what is alleged on the face of the complaint." Id. at 349. Applying that test, "a suit 'arises under' the Copyright Act if: (1) The complaint is for a remedy expressly granted by the Act, e.g., a suit for infringement . . . ; or, (2) The complaint asserts a claim requiring construction of the Act."[8] Id. at 349 (quotations, alterations omitted); see also id. at 355. This test "is essentially a reiteration of the 'well-pleaded complaint' rule that federal jurisdiction exists only when a federal question is

_____

[8]The Second Circuit noted that "jurisdiction might also exist, 'perhaps more doubtfully,' in a third category of case, 'where a distinctive policy of the [Copyright] Act requires that federal principles control the disposition of the claim.'" Bassett, 204 F.3d at 349 n.3 (quoting T.B. Harms, 339 F.2d at 828); see also Scholastic Entm't, Inc., 336 F.3d at 986 (stating Second Circuit's rule to "require[] the district court to exercise jurisdiction if: (1) the complaint asks for a remedy expressly granted by the Copyright Act; (2) the complaint requires an interpretation of the Copyright Act; or (3) federal principles should control the claims").

11

presented on the face of a properly pleaded complaint." Scholastic Entm't, Inc.,
336 F.3d at 986.

We join a number of other circuits in adopting the Second Circuit's
approach to this difficult jurisdictional issue.[9]  See Bassett, 204 F.3d at 349-51
(citing authority[10]); see also Scandinavian Satellite Sys. v. Prime TV Ltd., 291
F.3d 839, 844 (D.C. Cir. 2002) (also adopting Second Circuit's analytical
approach).

Applying the Second Circuit's test to this case, it is clear that the district
court had subject matter jurisdiction over 1mage's copyright claim under
28 U.S.C. § 1338(a).  1mage, in its complaint, specifically alleged a claim under

[9]In an analogous situation, this court, in Ausherman v. Stump, 643 F.2d 715
(10th Cir. 1981), previously held that federal courts did not have jurisdiction
under 28 U.S.C. § 1338(a) over a suit "brought on a contract" involving patents.
643 F.2d at 716, 718.  In reaching that conclusion, this court focused on the
complaint as pled, noting that "the complaint does not set forth a valid patent
infringement claim," despite "the fact that Ausherman had liberally sprinkled the
word 'infringement' throughout his pleadings." Id.  The approach this court took
in Ausherman is consistent with the Second Circuit's test we now adopt.

[10]The Second Circuit, in Bassett, 204 F.3d at 350-51, noted the First,
Fourth, Fifth, Ninth and Eleventh Circuits had adopted the Second Circuit's
approach to this jurisdictional determination: Royal v. Leading Edge Prods., Inc.,
833 F.2d 1, 2 (1st Cir. 1987); Gibraltar, P.R., Inc. v. Otoki Group, Inc., 104 F.3d
616, 619 (4th Cir. 1997); Arthur Young & Co. v. City of Richmond, 895 F.2d
967, 969-70 (4th Cir. 1990); Goodman v. Lee, 815 F.2d 1030, 1031 (5th Cir.
1987); Rano v. Sipa Press, Inc., 987 F.2d 580, 584 (9th Cir. 1993); Vestron, Inc.
v. Home Box Office Inc., 839 F.2d 1380, 1381 (9th Cir. 1988); MCA Television
Ltd. v. Pub. Interest Corp., 171 F.3d 1265, 1269-70 (11th Cir. 1999); see also
Gener-Villar, 417 F.3d at 203-04 (reaffirming that First Circuit has adopted
Second Circuit's analysis).

the Copyright Act for copyright infringement, see 17 U.S.C. § 501, and sought

actual damages and profits or, in the alternative, statutory damages, as well as

costs and attorney's fees specifically provided for under the Copyright Act, see id.

§§ 504-05. Based upon those allegations, the district court properly concluded

that it had subject matter jurisdiction over 1mage's copyright claim. See Bassett,

204 F.3d at 355-56 (holding federal court had subject matter jurisdiction because

plaintiff had alleged copyright infringement and sought injunctive remedy

provided for by the Copyright Act); see also MCA Television Ltd., 171 F.3d at

1269-70 (holding federal court had subject matter jurisdiction over copyright

infringement claim seeking preliminary injunction and damages provided for by

the Copyright Act); Rano, 987 F.2d at 584 (holding federal court had subject

matter jurisdiction over claim seeking injunction, impoundment, "damages and

profits," and attorney's fees provided for under Copyright Act); Arthur Young &

Co., 895 F.2d at 971 (holding federal court had subject matter jurisdiction over

claim alleging copyright infringement and seeking damages and injunctive relief

under Copyright Act); Vestron, Inc., 839 F.2d at 1381-82 (holding federal court

had subject matter jurisdiction over claim for copyright infringement seeking an

injunction, "damages and profits," costs and attorney's fees under Copyright Act).

   **B.    Whether the Colorado district court could compel arbitration in
          Ohio.**

This case presents a second possible jurisdictional problem. In Ansari, we

13

held that a district court does not have authority to compel arbitration in another district.[11]  See 414 F.3d at 1219-20.  Yet, in this case, the Colorado district court granted Reynolds's motion to compel arbitration in Ohio.  At the time, neither party questioned the district court's authority to do so.[12]  The question presented by this appeal, then, is whether the rule announced in Ansari is jurisdictional; that is, whether the district court was without any power to adjudicate Reynolds's motion to compel arbitration.  We conclude that Ansari did not state a jurisdictional prerequisite; rather, Ansari's rule is one of venue which the parties in this case have waived by not raising the issue before the district court.[13]  See

---

[11]Ansari further held that a district court is also without authority to compel arbitration in its own district if that would contravene the forum-selection provisions in the arbitration agreement.  See 414 F.3d at 1219-20.  That aspect of Ansari is not at issue in this case because neither party argues that the district court should have compelled arbitration in Colorado, contrary to their 1994 agreement.

[12]1mage did contest the motion to compel arbitration generally, but it did not raise this particular challenge to the district court's authority to compel arbitration.

[13]

Venue is sometimes confused with jurisdiction.  [However,] the two concepts are quite different.  As the Supreme Court put it in a leading case:

The jurisdiction of the federal courts – their power to adjudicate – is a grant of authority to them by Congress and thus beyond the scope of litigants to confer.  But the locality of a law suit – the place where judicial authority may be exercised – though defined by legislation relates to

(continued...)

14

Harris Capital Fund, LLC v. Grillo, 160 F. App'x 727, 728 (10th Cir. 2005) (unpublished) (treating Ansari as addressing venue).

### 1. Standard of review

We review this possible jurisdictional problem de novo. See Huerta v. Gonzales, 443 F.3d 753, 755 (10th Cir. 2006) (noting "we review issues of jurisdiction de novo").

### 2. Analysis

Ansari based its decision that a district court did not have the authority to compel arbitration in another district on the language of 9 U.S.C. § 4. See

---

[13](...continued)

> the convenience of litigants and as such is subject to their disposition. This basic difference between the court's power and the litigant's convenience is historic in the federal courts.

> This distinction between the court's power to adjudicate and the place where that authority may be exercised must always be recognized. It has two important consequences. Because venue is for the convenience of litigants it is a personal privilege of the defendants and can be waived by them. In this respect it is similar to jurisdiction over the person of defendants, which also can be waived, but unlike jurisdiction of the subject matter, which cannot be waived by the parties. The other consequence is that if the statutory rules on venue are not followed, and objection is made on the ground of improper venue, the action cannot be heard in that district, even though the court may have jurisdiction over the subject matter and over the defendants.

15 Charles Alan Wright, et al., Federal Practice & Procedure § 3801 (2d ed. 1986) (quoting Neirbo Co. v. Bethlehem Shipbuilding Corp., 308 U.S. 165, 167-68 (1939)) (footnotes, further quotation omitted).

Ansari, 414 F.3d at 1218-20.  Section 4 addresses motions to enforce arbitration

agreements by compelling arbitration and specifically provides that "[t]he hearing

and proceedings, under such agreement [to arbitrate], shall be within the district

in which the petition for an order directing such arbitration is filed."[14]  Other

circuits have referred to this language in § 4 as a venue provision.  See Dumont v.

Saskatchewan Gov't Ins., 258 F.3d 880, 887-88 (8th Cir. 2001); Doctor's Assocs.,

Inc. v. Stuart, 85 F.3d 975, 983 (2d Cir. 1996); Merrill Lynch, Pierce, Fenner, &

Smith, Inc. v. Lauer, 49 F.3d 323, 327 (7th Cir. 1995); Econo-Car Int'l, Inc. v.

Antilles Car Rentals, Inc., 499 F.2d 1391, 1394 & n.14 (3d Cir. 1974); Farr & Co.

v. Cia. Intercontinental de Navegacion de Cuba, 243 F.2d 342, 346 (2d Cir.

---

[14]More fully, 9 U.S.C. § 4 provides in relevant part:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in a manner provided for in such agreement. . . .  The court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement.  The hearing and proceedings, under such agreement, shall be within the district in which the petition for an order directing such arbitration is filed.  If the making of the arbitration agreement or the failure, neglect or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof.

16

1957); see also John W. Hinchey & Thomas V. Burch, The Effect of Forum-Selection Clauses on a District Court's Power to Compel Arbitration, 60 Disp. Resol. J. 55, 55, 56-57 (Nov. 2005-Jan. 2006); Venue of Motion to Compel, 60 Disp. Resol. J. 91 (Aug-Oct. 2005). Most relevant to this case, the Third and Seventh Circuits specifically referred to § 4 as a venue provision even as they held that under § 4's mandatory language, a district court could not compel arbitration in another district. See Lauer, 49 F.3d at 327-28; Econo-Car Int'l, Inc., 499 F.2d at 1394.

And courts have analogously treated other, similar FAA provisions as venue requirements. In Cortez Byrd Chips, Inc. v. Bill Harbert Construction Co., 529 U.S. 193 (2000), for example, the Supreme Court specifically addressed 9 U.S.C. §§ 9-11 as venue provisions. Id. at 195. Like § 4, 9 U.S.C. §§ 9-11 specify in which court certain arbitration proceedings under the FAA should take place.[15] In Cortez Bird Chips, Inc., the Supreme Court held that §§ 9-11 were

_____

[15]Section 9 provides, in relevant part:

If the parties in their agreement have agreed that a judgment of the court shall be entered upon the award made pursuant to the arbitration, and shall specify the court, then at any time within one year after the award is made any party to the arbitration may apply to the court so specified for an order confirming the award, and thereupon the court must grant such an order unless the award is vacated, modified, or corrected as prescribed in sections 10 and 11 of this title. If no court is specified in the agreement of the parties, then such application may

(continued...)

17

permissive (rather than restrictive) venue provisions.  See 529 U.S. at 195, 204.

Although this court, in Ansari, distinguished the permissive venue provisions at

issue in Cortez Bird Chips, Inc. from § 4, which instead uses "mandatory"

language, see Ansari, 414 F.3d at 1219, that distinction does not make § 4 any

less a venue provision.

Congress has established "general venue statutes" in 28 U.S.C.

§§ 1391-92.[16]  15 Charles Alan Wright, et al., Federal Practice and Procedure

---

[15](...continued)
be made to the United States court in and for the district within which
such award was made.  Notice of the application shall be served upon
the adverse party, and thereupon the court shall have jurisdiction of
such party as though he had appeared generally in the proceeding.

And 9 U.S.C. §§ 10 and 11 authorize the "United States court in and for the
district wherein the [arbitration] award was made" to vacate, modify or correct
that award.

[16]In part, those general venue statutes provide that for a case in federal
court based only upon diversity jurisdiction, venue is proper,

except as otherwise provided by law, . . . only in (1) a judicial district
where any defendant resides, if all defendants reside in the same State,
(2) a judicial district in which a substantial part of the events or
omissions giving rise to the claim occurred, or a substantial part of the
property that is the subject of the action is situated, or (3) a judicial
district in which any defendant is subject to personal jurisdiction at the
time the action is commenced, if there is no district in which the action
may otherwise be brought.

28 U.S.C. § 1391(a).  And for a case where "jurisdiction is not founded solely
upon diversity of citizenship," venue is proper,

(continued...)

18

§ 3804; see also id. § 3803; 17 Moore's Federal Practice § 110.01[3][a] (3d ed. 2006). In addition, however, Congress has also created "special" venue statutes. See 15 Charles Alan Wright, et al., Federal Practice & Procedure § 3804. "A special venue statute, expressly covering venue of a particular kind of action, will control over the general venue statutes, but provisions in the general statutes are read as supplementing the special statute in the absence of contrary restrictive indications in the special statute." Id. § 3803 (emphasis added; footnotes omitted); see also id. § 3804; 17 Moore's Federal Practice § 110.01[3][b] (referring to restrictive venue provisions as "exclusive"). It may be that § 4's mandatory language makes it a restrictive rather than a permissive venue provision. See Cortez Bird Chips, Inc., 529 U.S. at 195, 197-204 (discussing distinction between permissive and restrictive venue provisions in concluding 9 U.S.C. §§ 9-11 are permissive venue provisions); Ansari, 414 F.3d at 1220. However, parties can waive objections under restrictive venue provisions, just as they can under general venue provisions. See Radzanower v. Touche Ross & Co.,

---

[16](...continued)
except as otherwise provided by law, . . . only in (1) the judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of the property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

Id. § 1391(b).

19

426 U.S. 148, 149-51 (1976) (noting "[i]t has long been settled that the restrictive venue provisions of [the National Bank Act, 12 U.S.C.] § 94 can be waived by a defendant bank"); Interstate Commerce Comm'n v. Atl. Coast Line R. Co., 383 U.S. 576, 577, 579, 597 n.8 (1966) (noting waiver applied to Interstate Commerce Act's restrictive venue provisions); Am. Chem. Paint Co. v. Dow Chem. Co., 161 F.2d 956, 958-59 (2d Cir. 1947) (addressing whether parties had waived objection to venue under 28 U.S.C. § 48, providing for exclusive venue in patent infringement cases); Luper v. Capital Conveyor (In re Lee Way Holding Co.), 104 B. R. 881, 885 (Bankr. S.D. Ohio 1989) (noting "[e]ven restrictive venue provisions can be waived"); see also 15 Charles Alan Wright, et al., Federal Practice and Procedure § 3813 (noting party can waive venue provided by restrictive, as well as general, venue provisions).

Further, treating these FAA provisions as venue provisions makes sense in light of the fact that the FAA does not itself confer subject matter jurisdiction. See Moses H. Cone Mem'l Hosp., 460 U.S. at 26 n.32; Nukem, Inc., 400 F.3d at 829. And in fact, an earlier provision of § 4 addresses the need for a jurisdictional basis independent of the FAA, indicating that a party seeking to compel arbitration may do so in "any United States district court which, save for such [arbitration] agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy

20

between the parties." Finally, § 4 serves the purposes venue statutes traditionally serve; that is, it "refers to locality, the place where a lawsuit should be heard." 15 Charles Alan Wright, Federal Practice & Procedure, § 3801.

For these reasons, we conclude that Ansari's holding that a district court does not have authority to compel arbitration in another district is a statement addressing venue under the FAA.[17] And the parties in this case have waived any objection to venue because they failed to raise the issue in the district court. See generally Stjernholm v. Peterson, 83 F.3d 347, 349 (10th Cir. 1996) (noting parties can waive objection to venue by failing to raise the issue in timely manner before district court); 15 Charles Alan Wright, et al., Federal Practice & Procedure, § 3826.

**C.     Whether the district court erred in granting Reynolds's motion to compel arbitration of the parties' dispute.**

Turning to the merits of this appeal, 1mage argues that the district court erred in compelling the parties to arbitrate their dispute pursuant to the 1994 agreement. We disagree.

**1.     Standard of review**

---

[17]Because we conclude Ansari did not deprive the district court of its ability to adjudicate Reynolds's motion to compel arbitration, we need not address Reynolds's additional argument that 9 U.S.C. § 3, permitting a court to stay pending litigation while the parties arbitrate, provided the district court in this case with an alternate jurisdictional basis to adjudicate Reynolds's motion to compel arbitration.

21

This court reviews the district court's decision on a motion to compel arbitration de novo, employing the same legal standards the district court employed. See Ansari, 414 F.3d at 1218.

2.    **Analysis**

The FAA "manifests a liberal federal policy favoring arbitration." Comanche Indian Tribe v. 49, L.L.C., 391 F.3d 1129, 1131 (10th Cir. 2004) (quotations omitted). Nonetheless, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 83 (2002) (quotations omitted). "Absent some ambiguity in the [arbitration] agreement, . . . it is the language of the contract that defines the scope of disputes subject to arbitration." E.E.O.C. v. Waffle House, Inc., 534 U.S. 279, 289 (2002). "As with any other contract, the parties' intentions control, but those intentions are generously construed as to issues of arbitrability." Williams v. Imhoff, 203 F.3d 758, 764 (10th Cir. 2000) (alteration, quotations omitted).

In this case, 1mage and Reynolds agreed to arbitrate "any dispute [that] occurs between the parties arising out of or related to [the 1994] Agreement or its negotiation, execution or performance, whether such dispute is in contract, tort or

22

otherwise."[18]  In substance, through the 1994 licensing agreement, 1mage granted

Reynolds

a perpetual, fully paid-up, royalty-free, worldwide right and license:

> A.   to use, demonstrate, copy, and modify . . . the ISI Software[19] . . . , and
>
> B.   to distribute, lease, market and sublicense the ISI Software . . . ,
>
> . . . on a non-exclusive basis in the automotive industry and automotive after market (including manufacturers, non-dealer body shops, and parts

---

[18]More fully, the 1994 agreement provided:

> If any dispute occurs between the parties arising out of or related to this Agreement or its negotiation, execution or performance, whether such dispute is in contract, tort or otherwise, it will be submitted first to mediation under the mediation rules of the American Arbitration Association.  Should the mediation fail, the dispute will be submitted to arbitration. . . . Any mediation or arbitration will be held and the award deemed made in Dayton, Ohio. . . .  The decision and award of the arbitrator will be final and binding and the award given may be entered in any court of competent jurisdiction.  The parties will be entitled to discovery to the same extent provided for civil actions in the Southern District of the State of Ohio.  The parties agree to be bound by the decision of the arbitrator and judgment upon the award rendered thereby may be entered in any court having jurisdiction within the Southern District of Ohio.  The parties hereby submit to the in personam jurisdiction of the courts of the State of Ohio for all purposes of this Section and any disputes arising under this Agreement.  The Federal Arbitration Act (9 U.S.C. Sections 1-15), not state law, will govern the arbitrability of all claims and all aspects of the arbitration.

[19]The 1994 licensing agreement included, not only 1mage's document imaging software, but also related software which the agreement referred to together as the "ISI Software."

suppliers), and to other businesses under common control with an automotive sublicensee[; and]

. . . .

on an exclusive basis . . . to establishments primarily engaged in retail sales of new or used automobiles, trucks or tractors . . . , except six (6) existing reseller agreements and contracts . . . which currently do not exclude the automotive dealership market . . . [; and]

. . . .

directly to end-users on a non-exclusive basis in all markets other than those specified [above].

(Footnote omitted.) In exchange for this license, Reynolds paid 1mage a "one time license fee" of $ 1,750,000.

The 1994 agreement also anticipated that Reynolds could obtain updated software in the future. Along these lines, 1mage agreed that in the future it would "provide to Reynolds, at no cost to Reynolds, all updates, upgrades and enhancements to the Software, so that Reynolds may evaluate whether it is appropriate to make each such upgrade or enhancement generally available to its customers." If Reynolds chose to do so, it could then purchase those upgrades.

Subsequent updates, upgrades, enhancements and new products provided by ISI will be made available to Reynolds and become a part of the ISI Software and Documentation, provided the fees (which may be no greater than fees payable by other dealers, distributors or resellers of the ISI Software) are agreed upon by the parties at that time.

Two years later, in April 1996, Reynolds obtained 1mage's updated software, Release 5.5, as part of the parties' "Maintenance Agreement" for the

24

software 1mage had previously sold Reynolds through the 1994 agreement. The 1996 agreement provided that, in exchange for Reynolds's payment of an "Annual Maintenance Charge" of "$175,000 plus a $250 subscription fee for each licensee," 1mage would "provide subscription and maintenance service which includes revisions, updates and enhancements," "Repair of Warranty Defects," "New Versions and Releases" of the software, and "Continuing Education" covering the software.

The 1996 agreement did not contain an arbitration clause. But it did include a merger clause providing that "[t]his Agreement is the exclusive statement of the entire agreement between 1MAGE and [Reynolds] and supersedes all prior oral or written representations or agreements between the parties*, except the Software Licensing Agreement dated May 4, 1994, between Information Solutions, Inc.*, 1mage and [Reynolds], as to the subject matter hereof." (Emphasis added.)

The 1996 agreement further provided that either party could terminate the annual maintenance agreement after giving the other party ninety days' notice. After Reynolds notified 1mage that it was electing to terminate that agreement effective April 21, 2002, 1mage asserted that Reynolds would no longer have any license to use 1mage's Release 5.5 software. Reynolds, on the other hand, argued that it retained a license to use that updated software because Release 5.5 had

25

been incorporated into the 1994 agreement's perpetual license. That dispute underlies this litigation.

The specific question presented to the district court by Reynolds's motion to compel arbitration, then, was whether this dispute arose out of or was related to the 1994 agreement and was thus subject to that agreement's arbitration provision. In concluding that this dispute did arise out of or was related to the 1994 agreement, the district court recognized that that agreement not only granted Reynolds a perpetual license in the earlier version of 1mage's software, but it also specifically provided for the possibility that Reynolds would acquire later updated versions of the software from 1mage: The 1994 agreement's section 5.2 "provides that [s]ubsequent updates, upgrades, enhancements and new products provided by [1mage] will be made available to Reynolds and become a part of the ISI Software provided fees are agreed upon by the parties at that time." 1mage Software, Inc., 273 F. Supp. 2d at 1174 (quotations omitted). The district court then noted that there were several plausible interpretations of the relationship between the parties' 1994 and 1996 agreements. First, as 1mage argued, the 1996 agreement could be a licensing agreement for Release 5.5 that was completely separate from the 1994 perpetual licensing agreement. See id. at 1170. If so, the license terminated when Reynolds chose to terminate the 1996 maintenance agreement. See id. Second, as Reynolds argued, through the 1994 agreement's

26

section 5.2, the updated Release 5.5 that it obtained from 1mage through the 1996 agreement might have become part of the ISI software for which Reynolds had a perpetual license under the 1994 licensing agreement. If so, the 1996 maintenance agreement might be just that — a maintenance agreement whose later termination had no effect on the perpetual license, which included Release 5.5. See id. Or the 1996 agreement might have established the fees Reynolds had agreed to pay 1mage for the updated Release 5.5, which again had been incorporated into the original licensing agreement's perpetual license. See id. at 1170 n. 2. Acknowledging these plausible arguments, the district court concluded that, because Reynolds' interpretation – that the license to use the updated Release 5.5 software fell within the 1994 agreement's § 5.2 and therefore had been incorporated into the original agreement's perpetual license – had merit, the dispute underlying this litigation arose under that 1994 agreement and was thus subject to arbitration. See id. at 1174. We cannot improve on the district court's analysis; in light of the strong presumption of arbitrability, we agree fully with the district court's decision.

In challenging the district court's decision on appeal, 1mage relies almost exclusively on this court's decision in Riley Manufacturing Co. v. Anchor Glass Container Corp., 157 F.3d 775 (10th Cir. 1998). But Riley does not require a

27

different result.[20]

In Riley, this court addressed a situation involving two agreements between the same parties, the first containing a provision requiring arbitration and the second one without any arbitration provision. See id. at 777-78. These agreements were between Riley Manufacturing Co. ("Riley"), a company that produced "'sun tea' jars with copyrighted ornamental designs stenciled on" them, and Anchor Glass Container Corp. ("Anchor"), Riley's glass jar supplier. Id. at 776. In 1991, Riley and Anchor entered into a manufacturing and distribution agreement ("manufacturing agreement") under which "Riley agreed to provide all of Anchor['s] needs for sun tea jars . . . and Anchor . . . agreed to use reasonable efforts to market Riley's sun tea products." Id. (quotations omitted).

That manufacturing agreement expired in 1994. See id. at 777. In 1995, Riley threatened to sue Anchor for copyright infringement after it purportedly discovered that Anchor was still using Riley's copyrighted designs. See id. The

_____

[20]Reynolds asserts that, because 1mage never specifically relied on Riley in arguing against arbitration in the district court, 1mage has waived any argument based upon Riley for appeal purposes. 1mage did later rely on Riley in its motions seeking to have the district court vacate the arbitrator's awards and its pleadings arguing against confirmation of that award. But 1mage generally asserted before the district court many of the same arguments that it now asserts on appeal, arguing that the 1996 agreement was an entirely separate agreement from the 1994 agreement, and that the 1996 agreement was a separate licensing agreement for the newer version of the software, which has now been terminated. We, therefore, deem 1mage to have sufficiently preserved its argument based upon Riley.

parties then entered into a settlement agreement to resolve the copyright dispute. See id. That settlement agreement provided, among other things, that the parties waived "any and all claims either party now has or could ever have or become entitled to, which might arise under the Manufacturing Agreement." Id. (quotations omitted). The settlement agreement also "include[d] a series of provisions designed to reestablish a manufacturing relationship between Riley and Anchor," as well as a merger clause that indicated that the 1995 settlement agreement "constitutes the entire agreement of the parties hereto and cancels, terminates and supersedes any and all prior representations and agreements relating to the subject matter thereof." Id. at 778 (quotations omitted). This 1995 settlement agreement had no arbitration provision. See id.

Eight months after entering into the settlement agreement, Riley again purportedly discovered that Anchor was selling sun tea jars with Riley's copyrighted designs. See id. This time, Riley sued Anchor, alleging, inter alia, copyright and trade-secret claims. See id. In response, Anchor asserted that the original manufacturing agreement required the parties to arbitrate this dispute. See id. at 778-79. The district court disagreed and denied Anchor's motion to compel arbitration. See id. at 779.

On appeal, this court reversed. See id. at 785. In doing so, we concluded that the merger clause in the later settlement agreement, which provided that the

29

settlement agreement "cancels, terminates and supersedes any and all prior representations and agreements <u>relating to the subject matter thereof</u>," <u>id.</u> at 778 (emphasis added), did "revoke[] the prior right of the parties to demand arbitration" under the 1991 manufacturing agreement, but only as to the specific subject matter of that later settlement agreement, <u>id.</u> at 784. The parties would retain the right to arbitrate any dispute under the 1991 manufacturing agreement that was not considered part of the subject matter of the later settlement agreement.[21] <u>See</u> <u>id.</u>

<u>Riley</u> is clearly distinguishable from this case. First, while the original agreement in <u>Riley</u> had expired by its own terms, the original 1994 licensing agreement in this case between 1mage and Reynolds expressly continues in effect. The parties do not dispute this. Moreover, although both the later agreement in <u>Riley</u> and the 1996 agreement at issue in this case had merger provisions, those provisions are completely different. In <u>Riley</u>, the parties' merger provision "cancels, terminates and supersedes any and all prior representations and

---

[21]It is for this reason that this court remanded the action in <u>Riley</u> in order for the district court to determine which of Riley's claims arose under the subject matter of the settlement agreement and thus were not eligible for arbitration. <u>See</u> <u>Riley</u>, 157 F.3d at 783-85. Contrary to 1mage's assertion, <u>Riley</u> does not require the district court generally to determine the subject matter of the parties' agreements in this case. Nor does <u>Riley</u> hold that a second agreement without an arbitration provision automatically precludes arbitration of any dispute related to that second agreement. Rather, arbitrability turns on the language of the agreements involved and the parties' intent in creating those agreements.

30

agreements relating to the subject matter thereof." Id. at 778. The merger clause in this case, on the other hand, specifically excepted 1mage's and Reynolds's original 1994 contract: "[t]his Agreement is the exclusive statement of the entire agreement between 1MAGE and [Reynolds] and supersedes all prior oral or written representations or agreements between the parties, except the Software Licensing Agreement dated May 4, 1994, between Information Solutions, Inc., 1mage and [Reynolds], as the subject matter hereof." (Emphasis added.) Riley, then, does not support 1mage's challenge to the district court's decision to compel arbitration in this case.

## III.   CONCLUSION

For these reasons, we AFFIRM the district court's decision.